**E. L. CONWELL AND COMPANY,
a Delaware Corporation**

v.

**Charles H. GUTBERLET, Jr. and the
Arundel Corporation, a Maryland
Corporation.**

**Civ. A. No. 19965.**

United States District Court
D. Maryland.

April 2, 1969.

---

Harry Adelberg and Donald R. Stutman, Adelberg, Adelberg & Rudow, Baltimore, Md., for plaintiff.

J. Cookman Boyd, Jr., Walter S. Levin, Sauerwein, Boyd & Decker, Baltimore, Md., for defendants.

WATKINS, District Judge.

E. L. Conwell & Company, a Delaware corporation (hereinafter Plaintiff) sued Charles H. Gutberlet, a citizen of Maryland (hereinafter Gutberlet) and The Arundel Corporation, a Maryland corporation (hereinafter Arundel) in a diversity case, seeking injunctive relief against both Gutberlet and Arundel, alleging the necessary jurisdictional amount. On the filing of the complaint, a show cause order was issued, to which an answer was duly filed. Pretrial memoranda were filed by the parties; the case was heard on the merits and orally argued; and post-trial memoranda have been filed. There is little dispute as to the facts, which the court finds as follows:

### FINDINGS OF FACT

Plaintiff has been continuously engaged in the field of engineering inspection and testing of construction materials since 1894, with accounts throughout the United States. The Materials Division of Arundel produces and sells sand, gravel and other aggregates, and produces

ready-mixed concrete for sale. For over thirty years Arundel has contracted with Plaintiff for the testing of aggregates going into concrete, the certification of such tests, and the design and certification of mix formulas.[1] Tests were made at Arundel concrete plants. The most recent contract was in the form of a letter agreement dated January 17, 1967, which in accordance with its provisions was terminated as of December 1, 1968 by letter from Arundel dated May 27, 1968.

Before the agreement of January 17, 1967, Arundel had become dissatisfied with Plaintiff's overall operation, not from a technical standpoint, but specifically as to the office management of Plaintiff's Baltimore office. Arundel requested the replacement of Plaintiff's Baltimore manager (Barvir) and suggested the employment of Gutberlet. He had attended, but not been graduated from, Drexel Institute of Technology; had received the degree of Bachelor of Science in Civil Engineering from Villanova; attended Johns Hopkins University Graduate School part-time for one and one-half years taking courses in structural analysis; went to work for The Glenn L. Martin Company in June 1955, working for two and one-half years as a stress engineer analyzing aircraft metals; worked for J. E. Greiner & Company for two years and two months as a bridge design engineer; was self-employed from February 1, 1961 to December 14, 1964 as a consulting engineer, dealing primarily with buildings; was then a structural design engineer for Portland Cement Association, in "a promotional type of job where you call on architects, engineers, and owners, and try to show them the advantages of designing in concrete"; and on May 1, 1966 was employed by Plaintiff as Manager of its Baltimore branch laboratory. The employment agreement, signed by Gutberlet, read in pertinent part as follows:

"Due to the nature of this position, we ask that you agree to the following.

(1) Should your employment with us be terminated for any reason you will not accept employment with a competitor or client of ours nor engage in a competing business venture within 150 miles of Baltimore for a period of three years after the termination.

(2) You will not engage in outside employment while in our employ; all business to be conducted through the firm."

Prior to this time Gutberlet had had "no experience at all working with cement, or cement products, or concrete products * * *"[2]; that is, while he had designed things to be made out of concrete, he had done no professional sampling, testing or inspecting of cement, nor supervised the loading of tested and approved cement, or any "complete concrete materials testing, mix design, evaluation-quality control", or checked "the continuous batch plant supervising and field testing and control." He denied learning these things before or after coming with Plaintiff, stating that his duties for Plaintiff were to "manage their Baltimore branch office in a managerial position and part of the statement was that I did not have to have a technical background to do this work"; and that it was not intended that he should be taught, and he was not taught, procedures peculiar to Plaintiff's operation. He learned nothing at all about specialized material testing; and nothing that was peculiar to Plaintiff's business. He was not taught, and did not learn, the testing, sampling and interpretation

---

1. The services were substantial, Arundel paying (in round figures) $76,000 for each of 1965 and 1966; $113,000 for 1967, and $82,000 for the first nine months of 1968.

2. This, and the balance of this paragraph of the opinion, comes from Gutberlet's deposition, taken by, and offered in evidence by, the plaintiff. Gutberlet ultimately testified in open court. There was no significant difference between his deposition testimony and his testimony in open court.

of results with respect to materials going into concrete.

When he was first employed by Plaintiff, Gutberlet asked if he could complete some structural engineering design work on which he was then working. He was given the requested permission and was told to try to get similar work for Plaintiff. At the end of his employment, Gutberlet spent about twenty-five per cent of his time on this activity, some of which was then pending, uncompleted.

Shortly after he was employed, Plaintiff's Vice President and General Manager (Capper) spent one day with Gutberlet discussing operations generally; staff; methods; the Philadelphia laboratory, so that Gutberlet would know where to go for help. From time to time [3] Gutberlet would telephone Capper, mostly with respect to procedures to be followed by the men working under him. For the most part these inquiries would be answered by referring Gutberlet to the appropriate portions of standard manuals, such as the standards of the American Society for Testing Materials.[4]

Capper had since 1966 been concerned that Arundel might set up its own testing laboratory. Shortly after the employment by Arundel of a new Vice President and General Manager of its Materials Division in January 1968 (Mallon), Mallon appointed a task group of Arundel employees to investigate Arundel's quality control requirements. Part of this investigation included (to Plaintiff's knowledge) the observation of Plaintiff's technicians, and Plaintiff's time schedules. A written report was prepared in March 1968. It considered three possibilities—"A"—Arundel doing aggregate testing and field concrete testing, an outside company doing the concrete testing and certification of all materials; "B"—a complete testing service for both concrete and aggregates, plus certification, by an outside company; and "C"—Arundel handling all testing, with the outside company furnishing certifications. The report in general recommended that Arundel set up its own controls laboratory, which would include the concrete testing (but not certification) formerly performed by Plaintiff. Apparently a copy of this report was given to Plaintiff at about the time the report was prepared. Definitely Plaintiff knew about the nature of the task group's study, since on February 7, 1968, Plaintiff submitted to Arundel a written estimate of costs for various combinations of services, along the lines of, but somewhat different from, those incorporated in the task group report.

On March 5, 1968, Gutberlet wrote to Arundel advising of certain changes in personnel for the purpose of staffing the quality control program to serve Arundel. It was stated that Ronald T. Lange would be in charge of the operation, with William J. Whitecotton as his assistant.

Lange had been employed by Plaintiff for about fifteen years, as a "concrete inspector" doing quality control work, checking concrete aggregates and mix designs. Some of the procedures he learned, including "short cuts", were taught him by Plaintiff; most he taught himself.

Whitecotton had worked for Plaintiff for approximately two years testing and inspecting concrete, cement and cement products. All he knew about this subject matter he learned while employed by Plaintiff.[5]

Neither Lange nor Whitecotton had any restrictive covenant in his employ-

3. Capper put this as possibly two to three times a week for six months. Gutberlet thought it might average out to once a month. The difference is not great, or significant.

4. Capper admitted this, but also initially took the position that Gutberlet was told certain "short cuts" which Capper regarded as "trade secrets." The question

of trade secrets or confidential information will later be specifically discussed.

5. The summaries with respect to Lange and Whitecotton, as well as the later summary of their employment by Arundel, are from their depositions, taken by and offered in evidence by Plaintiff. Both were present in court, but neither was called to testify by either side.

ment arrangement. Neither did Barvir, the former Baltimore Branch Manager who was replaced by Gutberlet after some twenty-five years employment.[6]

About the end of August, 1968, Gutberlet was approached by Arundel with respect to employment by Arundel. Gutberlet talked to Capper early in September about the offer. Capper did not at that time refer to the employment contract, but did so about a week or ten days later. Thereafter Gutberlet sent a copy of the contract to Arundel which had not previously had knowledge thereof. Arundel then submitted it to its counsel. Capper had a series of personal and telephone conversations with Gutberlet during the latter part of September, in which he offered to meet Arundel's offer, but Gutberlet refused, and went with Arundel on, or as of, October 1, 1968.

Lange was approached the second week in September by Arundel, was offered more money, and went with Arundel. Whitecotton first learned at the end of August 1968 that Arundel might be interested in employing him. He was not happy in his work with Plaintiff; "the whole process, the whole setup they had didn't please me, and I more or less was just planning on picking up all the knowledge that I could and going elsewhere, regardless of Arundel or anyone, I was just looking for a job." He resigned from plaintiff's employment about the middle of September.

Gutberlet's meager association with testing of cement and concrete, previously summarized from his deposition, was further covered in his oral testimony. When he came with Plaintiff as Manager, he found no time records, no filing system, and no cost accounting procedures. He tried to work up charges on

bills and in checking the Arundel account he found that direct labor charges almost equalled receipts from Arundel; and that if one-half of his time were to be charged to the Arundel account, Plaintiff would be paying out more than it received.

Gutberlet also testified, without contradiction, that he did not perform any tests himself; that he was never told that anything (except cost figures) was a secret, or unique, or peculiar to Arundel, or "to be kept in the family;" that he relayed instructions from Capper to the men actually performing the tests, and that no methods were disclosed to him that were not in the manual of the American Society for Testing Materials.

Actually, Plaintiff's version of Gutberlet's limited functions in the field of testing, and the absence of any real trade secrets or confidential information, is not materially different from Gutberlet's testimony. Although Capper at first referred to Plaintiff's own "methodology and trade secrets", it soon became apparent[7] that what really was meant was that Plaintiff was thoroughly familiar with the materials regularly used by Arundel, and their characteristics, so that the effect of changes in proportions could be forecast without some of the tests that would be required with respect to an entirely new formula, or the use of not previously tested materials. If new sources of materials were used, regular laboratory tests would have to be run, the same as any other laboratory would have to do. Capper admitted that all tests used were those that would pass the standards of the American Society for Testing Materials, but referred to a 15–20 per cent safety factor (really margin of error) allowed by Plaintiff in its calculations.

6. This was asserted by Arundel's counsel, and not denied by Plaintiff's counsel. Barvir is presently employed by Harry T. Campbell Sons Corporation, a client of Plaintiff and a competitor of Arundel.

7. This, and the following, are not, and are not intended to be, a reflection on Capper, who was one of the most refreshingly honest and candid witnesses ever to appear before this Court. His initial appraisal of his company's work is understandable; his willingness to concede that it was not really unique, when this was brought home, is highly commendable.

Capper further testified that when Gutberlet came with Plaintiff, Gutberlet did not have the ability to determine what tests to make, or how to make them. He was not subjected to any special program of instruction, but was simply "exposed" with possible osmosis. In no instance was Gutberlet advised that Plaintiff's procedures were standard up to a certain point and that then Plaintiff put in a "secret ingredient" unknown to other laboratories. Barvir and Lange had all of Gutberlet's exposure, and much greater experience; and were able to conduct all tests.

Capper agreed that Arundel customers were in Plaintiff's laboratory to watch tests, and that these were not regarded as "trade secrets." What Plaintiff was doing for Arundel was open to Arundel, even when it was known that Arundel might set up its own laboratory. While Arundel had not asked for and had not been given Plaintiff's laboratory test data, they were the "client's property" and during the course of change-over, Capper agreed to give Arundel any data it requested.

## THE LAW

 The parties are correctly in ageement that in this diversity case the law of Maryland is to be applied. Numerous Maryland cases have been cited by Plaintiff and defendants on the question of the enforceability of restrictive covenants in employment contracts, all of which have been considered by the court. The recent summary is found in Ruhl v. F. A. Bartlett Tree Expert Co., 1967, 245 Md. 118, 225 A.2d 288, when the court said:

"This Court has had a number of cases involving the validity of restrictive covenants in a contract of employment. Covenants of this nature are in restraint of trade; the test is whether the particular restraint is reasonable on the specific facts. The general rule in Maryland, as in most jurisdictions, is that 'restrictive covenants in a contract of employment, by which an employee as a part of his agreement undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public."' MacIntosh v. Brunswick Corp., 241 Md. 24, 31, 215 A.2d 222, 225 (1965). See also Silver v. Goldberger, 231 Md. 1, 6, 188 A.2d 155 (1963) and cases therein cited; Restatement, Contracts, §§ 515, 516(f).

"The development of the law on this subject is analyzed in Blake, 'Employee Agreements Not to Compete, '73 Harv. L.Rev. 625 (1960). The multitude of cases are classified in two encyclopedic annotations in 41 A.L.R.2d 15 (1955) and 43 A.L.R.2d 94 (1955). There is no arbitrary yardstick as to what protection of the business of the employer is reasonably necessary, no categorical measurement of what constitutes undue hardship on the employee, no precise scales to weigh the interest of the public. The decisions in this State and in other jurisdictions are helpful, but, as in so many other fields of the law, the determination must be made on the particular circumstances." (245 Md. 123–124, 225 A.2d 291).

\* \* \* \* \* \*

"This Court has recognized the importance of the personal relationship between the employee and his employer's customers whom the employee serves on a particular route, when the element of competition in the sale of the product was less significant than the employee's relationship with the persons he served. In such cases, restrictive covenants were held valid when they were found reasonable as to duration and area. Western Md. Dairy v. Chenowith, 180 Md. 236, 23 A.2d 660 (1942); Tolman Laundry v. Walker, 171 Md. 7, 187 A. 836 (1936);

Deuerling v. City Baking Co., 155 Md. 280, 141 A. 542, 67 A.L.R. 993 (1928). In Tawney v. Mutual System of Md., 186 Md. 508, 521, 47 A.2d 372, 379 (1946), in which restrictive covenants between a small loan company and its employees were held invalid because of the unreasonable scope of the area in which competition was excluded, Judge Henderson said, for the Court: 'We think the route cases are distinguishable, for while the route is defined in terms of area, exclusion from that area is only a means of preventing use of the lists of customers.' In Silver v. Goldberger, supra, an employment agency business was involved; the Court affirmed the lower court's dismissal of the employer's bill for an injunction. Judge Horney, for the Court, said at 231 Md. 8, 188 A. 2d [155] 159: 'Had the appellant been able to show that his former employees had or were likely to take some of his clients away from him, the situation might have been different * * *' In all these cases, on varying facts, it is the extent and importance of the personal contact of the employee with the customers to which the Court has looked as largely determining whether the restraint is a reasonable one for the protection of the employer's business." (245 Md. 124–125, 225 A.2d 292).

A further quotation, from Silver v. Goldberger, 1963, 231 Md. 1, 188 A. 2d 155, is justified, particularly because of its reference to the relevance of trade secrets. The court said:

"While a person may not be restrained from engaging in any business or vocation (useful to the community) which he is qualified to conduct or perform, the general rule is that restrictive covenants in a contract of employment, by which an employee as a part of his agreement undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public. 17 C.J.S. Contracts §. 254. See also Restatement, Contracts, § 515; Deuerling v. City Baking Co., 155 Md. 280, 141 A. 542, 67 A.L.R. 993 (1928); Tolman Laundry v. Walker, 171 Md. 7, 187 A. 836 (1936). But the cases draw a distinction between restraints that are justified and those that are not.

"There is a line of cases which holds that restraint is justified if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee. And there is another line of cases which holds that restraint is not justified if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor just as the former employer did through having a competent and efficient employee. See 6A Corbin, Contracts, § 1394.[1]

1. "Professor Corbin also mentions a third class of cases, not here relevant, holding that justification exists if the service involves a knowledge of trade secrets that might be divulged and confiscated in case of service to a competitor.

"Contracts (containing restrictive covenants) of agents, salesmen, deliverymen and other employees, who, in operating a regular route, or in serving the same customers constantly, come into personal contact with the customers of the employer, usually come within the class or type of cases in which justification does exist. Such contracts have been held by this Court to be valid and enforceable in cases of a bakery route operator, Deuerling v. City Bakery Co., supra, a laundry route operator, Tolman Laundry v. Walker, supra, and milk and dairy products employees, Western Maryland Dairy v. Chenowith, 180 Md. 236, 23 A.2d · 600 (1942).

"On the contrary, the restrictive covenants in employment contracts between an employer and its employees were held invalid in Tawney v. Mutual System of Md., 186 Md. 508, 47 A.2d 372 (1946), a case that comes within the class or type of cases holding that there is no justification for restraint where a former employee does no more than become an efficient competitor of his former employer, and does not do so by exploiting his personal contacts with customers or clients of his former employer."

■ On the basis of these cases, and the authorities therein cited, the court finds, as

## CONCLUSIONS OF LAW

that Plaintiff is not entitled to any of the relief prayed.

I. The significant restriction in Gutberlet's contract of employment is:

*"Should your employment with us be terminated for any reason you will not accept employment with a* competitor or *client of ours* nor engage in a competing business venture within 150 miles of Baltimore for a period of three years after the termination." (Emphasis supplied).

■ The language was that of plaintiff, and any ambiguities are to be construed against it. The italized language is in terms prohibitive of Gutberlet *ever* accepting employment with a client of Plaintiff, *any time and/or anywhere.*

(a) This is not a hypertechnical construction, particularly under the facts of this case. Arundel had given authorized notice of termination of its contract "at a time mutually agreed upon, but to be no later than December 1, 1968." [8] After the time "mutually agreed upon but * * * no later than December 1, 1968," Arundel would no longer be a "client" of Plaintiff, and from that time on there would be no

restriction on Gutberlet going with Arundel. Plaintiff could easily have provided (if it so desired and meant) that Gutberlet should not accept employment from a present or past client.

(b) As will be further developed under Point II, Arundel never has been, is not, and so far as appears, does not ever intend to be, engaged in a business in competition with Plaintiff.

II. Gutberlet does not fall within the types of employment as to which the Maryland Court of Appeals has upheld restrictive employment contract provisions.

Significant differences from this case, and the typical cases in which Maryland has upheld (or under stated principles presumably would uphold) restrictive covenants, exist:

1. Gutberlet did not seek out Arundel, either for employment, or as a client.

2. Gutberlet has not set up a business competitive of Plaintiff.

3. Arundel is not competitive with Plaintiff. Plaintiff renders testing services to others. Arundel does not offer testing services to others; it seeks only to perform its (or some of its) testing services for itself only.

4. This is not a personal-contact case, such as the route salesmen cases.

5. Gutberlet certainly has no peculiar knowledge of any trade secrets of Plaintiff, or any confidential information, if any such did exist. If any such did exist—and the court finds that none did—Lange would have had far greater grasp and knowledge; and it is not claimed by Plaintiff that Lange cannot properly be employed by Arundel, fully free to use any knowledge learned while working for Plaintiff.

6. Plaintiff admits that Arundel is entitled to all data as to testing done for Arundel.

7. Plaintiff admits that even without such data, Arundel could by ordinary

---

8. The termination letter of May 27, 1968 specifically requested from Plaintiff "a proposal to provide cement testing and concrete certification as per our specifications * * *"

well-known procedures, conduct accurate tests.

8. No special program of test-education was conducted for Gutberlet. Even if it had been, this would at the most allow a claim for insignificant money damages, but would not be a basis for injunctive relief.

Plaintiff's claims for injunctive relief are denied. The Court will, on submission, enter an order dismissing the complaint, with costs to defendants.