## MARYLAND UNDERCOATING COMPANY, INC., Appellee,

v.

## George D. PAYNE, Appellant.

### No. 78–1648.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1978.

Decided July 20, 1979.

Geoffrey F. Birkhead, Norfolk, Va. (Crenshaw, Ware & Johnson, Norfolk, Va., on brief), for appellant.

Leland S. Van Koten, Baltimore, Md. (John A. Scaldara, Wright & Parks, Baltimore, Md., on brief), for appellee.

Before WINTER, RUSSELL and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

George D. Payne appeals from the district court's issuance of a preliminary injunction. For reasons to be stated, we vacate the order granting Maryland Undercoating's motion for a preliminary injunction which prevented Payne's employment by Predelivery Service Corporation (PSC).[1]

In June 1973, Payne began his employment with Maryland Undercoating as its manager of operations at its Portsmouth, Virginia facility. Maryland Undercoating, a Maryland corporation with its principal place of business in Baltimore, Maryland, is involved in the processing of motor vehicles for importers, distributors and dealers. Its principal business is the decosmolining of (removal of the protective coating from) imported vehicles, undercoating, pierside servicing, storage and pierside handling of imported motor vehicles. Payne's duties as manager of operations consisted of supervising the production personnel and running the Portsmouth operation on a day-to-day basis. In the capacity of manager of operations, Payne did not have extensive administrative duties and was not involved in the pricing of jobs or the negotiation of contracts.

In December 1974, Payne was made general manager of Maryland Undercoating's Portsmouth operation. As a condition to his further employment as general manager of Maryland Undercoating's Portsmouth operation, Payne was required to execute an employment contract. The contract, signed by Payne on December 26, 1974, contained, *inter alia*, the provisions preventing Payne from at any time disclosing Maryland Undercoating's business methods or any confidential information learned in the course of his employment and for a period of two years after employment of engaging in a similar line of business in competition with Maryland Undercoating within thirty miles of Portsmouth Marine Terminal or Dundalk, Maryland Marine Terminal. James G. Robinson, President of Maryland Undercoating, testified that Payne, as general manager, was privy to such confidential information as employee records, salaries of employees, pricing information, cost information, profit margins, and the hours of work required for the performance of services on various accounts.[2]

During the time Payne was employed with Maryland Undercoating at its Portsmouth Facility, Maryland Undercoating serviced the following makes of vehicles: Ford Fiesta; Ford domestic trucks; BMW; Renault; Peugeot; and Volvo. The Ford Fiesta account constituted approximately sixty to seventy percent of Maryland Undercoating's business.

In early March 1978, Maryland Undercoating received a letter dated March 7, 1978 from Ford informing it that Ford was terminating the service agreement for the Fiesta account, effective May 7, 1978. The letter stated that the termination was in no way related "to performance criteria on the

1. Maryland Undercoating has moved to strike from the record and the joint appendix the Motion for Stay, Brief and Exhibits in Support of Motion for Stay filed by Payne with the district court on September 19, 1978. These matters are part of the record in this case; therefore, Maryland Undercoating's motion is denied. We intimate no view as to the proper allocation of costs relating to the inclusion of these matters in the joint appendix.

The material contained in Payne's said Motion for Stay, Brief and Exhibits in Support of Motion for Stay was not relied upon in the preparation of this opinion.

Maryland Undercoating has also moved to amend the joint appendix by striking page 111 thereof and substituting a document marked "Exhibit A". Payne having no objection to such amendment, Maryland Undercoating's motion is granted.

2. As general manager, Payne had also negotiated contracts with two of Maryland Undercoating's customers.

part of Maryland Undercoating," but was due to the expansion of Predelivery Service Corporation to the port of Portsmouth. PSC is a wholly owned subsidiary of Ford Motor Company that operates at various ports around the country. Presently, PSC performs decosmolining, pierside and storage services for Ford Fiestas in Portsmouth, services previously performed by Maryland Undercoating.

Robinson testified that soon after receiving Ford's letter of March 7th, he informed Payne that Ford was terminating its service agreement for Fiestas with Maryland Undercoating. Payne testified that after he learned of Ford's termination of the Fiesta account, he applied to PSC for a job.[3] In a letter dated March 17, 1978, Payne received an offer of employment as plant operations manager from PSC. On April 19th, Payne informed Robinson that he was resigning from Maryland Undercoating and accepting employment with PSC. In a letter sent to Robinson dated April 20, 1978, Payne confirmed the fact that he was resigning, effective May 5, 1978.[4] Payne commenced his employment as plant operations manager at PSC's Portsmouth facility on May 8th.

PSC began actively operating in May, after Payne's arrival. Within several weeks of the start of PSC's operations, twelve to fourteen employees of Maryland Undercoating went to work for PSC.[5] Richard V. Petro, operations manager of PSC's Portsmouth facility, testified that whenever an application indicated that an applicant worked at Maryland Undercoating and that Payne was the last supervisor, he would ask Payne for his evaluation of the employee and Payne would give his evaluation.[6] Payne corroborated Petro's testimony on this point.

On June 27, 1978, Maryland Undercoating filed this suit alleging that Payne had breached his contract with Maryland Undercoating by accepting employment with PSC, a corporation engaged in a similar line of business in competition with Maryland Undercoating within the requisite geographic area delineated in Payne's employment contract. It sought to enforce its employment contract with Payne by means of a permanent injunction. As a stop gap measure, Maryland Undercoating sought a preliminary injunction pursuant to FRCP 65(a), which was granted by the district court.[7]

---

3. Payne argues that his action was motivated by the potential adverse impact the loss of such a large portion of Maryland Undercoating's business might have had on his continued employment at Maryland Undercoating.

4. Payne's employment contract with Maryland Undercoating provided that his employment at Maryland Undercoating was terminable at will by either party.

5. The district court did not determine whether Payne induced any of Maryland Undercoating's employees to terminate their employment with Maryland Undercoating and accept employment with PSC. The court ruled that even if the employees independently decided to terminate their employment with Maryland Undercoating their employment with PSC indicated that the firms were in competition. What is overlooked is that there is no public policy against two businesses bidding for the services of employees; indeed, the contrary would seem to be true where the employee whose services are sought may quit his old employer at any time. Absent some ulterior motive or illegal purpose, such conduct is not actionable. See 57 C.J.S. Master and Servant § 625.

6. Petro also stated that he did not solicit Payne's evaluation of applicants who were employees of Maryland Undercoating prior to the time Payne terminated his employment with Maryland Undercoating.

7. The district court enjoined Payne from: (1) being employed by PSC, or any other competitor of Maryland Undercoating operating within thirty miles of the Portsmouth Marine Terminal at Portsmouth, Virginia, and within thirty miles of the Dundalk Marine Terminal at Dundalk, Maryland, for a period of two years following May 6, 1978; (2) directly or indirectly inducing or attempting to induce any of the employees of Maryland Undercoating to terminate their employment with Maryland Undercoating; (3) directly or indirectly using or divulging any confidential or secret information belonging to Maryland Undercoating; and (4) directly or indirectly inducing or attempting to induce any customer of Maryland Undercoating to terminate its relationship with Maryland Undercoating.

No evidence of divulging Maryland Undercoating's secrets to PSC was presented, as was no evidence of inducing its customers.

■ In passing on Maryland Undercoating's motion for a preliminary injunction, the district court correctly stated that the standard for determining whether interlocutory injunctive relief should issue is the balance-of-hardship test under *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977). See also *North Carolina State Ports Authority v. Dart Containerline Co.*, 592 F.2d 749 (4th Cir. 1979); *Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978); *United States v. Commonwealth of Virginia*, 569 F.2d 1300 (4th Cir. 1978); *Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119 (4th Cir. 1977). The balance-of-hardship test can be summarized as follows. The decision of the district court to grant or deny interlocutory injunctive relief should be based upon a "flexible interplay" among all the factors to be considered, i. e., likelihood of irreparable harm to the plaintiff without an injunction; likelihood of harm to the defendant with an injunction; plaintiff's likelihood of success on the merits; and the public interest. The first step in determining whether interlocutory injunctive relief should issue is for the court to balance the likelihood of irreparable harm to the plaintiff without an injunction against the likelihood of harm to the defendant with an injunction. If a decided imbalance of hardship should appear in plaintiff's favor, it is enough that grave or serious questions are presented; plaintiff need not show a likelihood of success on the merits. The need for plaintiff to show likelihood of success on the merits increases as

the probability of irreparable injury to plaintiff without an injunction decreases.[8] Finally, the court should consider wherein lies the public interest, sometimes described as preserving the *status quo ante litem* until the merits of a serious controversy can be fully considered by a trial court.[9] See *Blackwelder*, 550 F.2d at 195–97.

■ In the instant case, the district court determined that preserving the opportunity to grant effective relief argued for temporary relief; that Maryland Undercoating would suffer irreparable harm if a preliminary injunction did not issue since Payne could convey confidential information, such as Maryland Undercoating's costs, prices, and information concerning employees to PSC; that Maryland Undercoating was likely to succeed on the merits of the case since the parties conceded that the non-competition provisions of Payne's employment contract were valid and the court had determined that PSC was in competition with Maryland Undercoating in Portsmouth; and that the public interest would be served by maintaining the *status quo* as it existed prior to the time Payne left the employment of Maryland Undercoating and sought and accepted employment with PSC.[10] Based on these determinations, the court granted the motion for a preliminary injunction.[11]

At no point in its oral opinion or in its order did the district court discuss what, if any, harm was likely to be caused Payne by

8. Where the likelihood of irreparable harm to the plaintiff without an injunction may be characterized as simply "possible," plaintiff's likelihood of success on the merits can be decisive of whether interlocutory injunctive relief should issue. Nevertheless, likelihood of success on the merits remains merely one "strong factor" to be weighed alongside both the likely harm to the defendant with an injunction and the public interest. *Blackwelder Furniture Co.*, at 195.

9. Although the decision to grant or deny interlocutory injunctive relief depends upon a flexible interplay among all the factors considered, it is clear that "the two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to

the defendant with a decree." *Id.* at 196. See also *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978).

10. The court orally stated its findings of fact and conclusions of law from the bench.

11. In its order for preliminary injunction, the court pointed to its determinations that Maryland Undercoating had established probable success on the merits and that Maryland Undercoating had and would suffer immediate and irreparable injury through the loss of employees, customers, and confidential and secret information as the bases for granting Maryland Undercoating's motion for a preliminary injunction.

the issuance of a preliminary injunction.[12] Consequently, the court did not balance the likelihood of irreparable harm to Maryland Undercoating without an injunction against the likelihood of harm to Payne with an injunction, the first step in determining whether a preliminary injunction should issue. In terms of hardship, the court focused solely on the likelihood of irreparable harm to Maryland Undercoating if an injunction did not issue.

As we said in *Blackwelder*, "[t]he decision to grant preliminary relief cannot be intelligently made unless the trial court knows how much the precaution will cost the defendant." 550 F.2d at 196. The district court's failure to consider what, if any, harm was likely to be caused to Payne and the issuance of a preliminary injunction without balancing the hardships, as required, when determining whether to grant or deny Maryland Undercoating's request for interlocutory injunctive relief, supports our conclusion to vacate the order.[13]

■ We also think the district court erred in concluding that PSC is in competition with Maryland Undercoating in the port of Portsmouth. The court relied on the cases of *First National Bank v. Hartford*, 273 U.S. 548, 47 S.Ct. 462, 71 L.Ed. 767 (1926), and *Schill v. Remington Putnam Book Co.*, 179 Md. 83, 17 A.2d 175 (1941), as establishing an applicable definition of competition. In *First National Bank*, a case in which the Supreme Court was dealing with a state statute that was used to tax national bank shares but not state bank shares on the ground that the state banks were not in competition with the business of the national bank, the Court stated:

"We do not conceive that in order to establish the fact of competition it is necessary to show that national banks and competing investors solicit the same customers for the same loans or investments. It is enough as stated if both engage in seeking and securing in the same locality capital investments of the class now under consideration which are substantial in amount." 273 U.S. at 559, 47 S.Ct. at 466.

In *Schill*, the court stated:

"Competition implies a struggle for advantage between two or more forces, each possessing in substantially similar if not identical degree, certain characteristics essential to the contest; and as used in political economy, is thus defined in Funk & Wagnalls' dictionary: 'An independent endeavor of two or more persons to obtain the business patronage of a third by offering more advantageous terms as an inducement to secure trade.'" 17 A.2d at 178.

In conformity with the above definitions, the district court stated that in determining whether PSC is in competition with Maryland Undercoating in Portsmouth, it must "deal with the question of whether or not [PSC is] in a similar business seeking to perform similar work and trying to obtain customers, some of which may be customers of . . . Maryland Undercoating or a potential customer of Maryland Undercoating." The court concluded that based upon the evidence there is no question but that PSC is soliciting customers in Portsmouth

---

**12.** As previously stated, the likelihood of harm to the defendant with an injunction is one of "the two more important factors" to be considered in determining whether a preliminary injunction should issue.

**13.** Additionally, in its oral opinion the district court stated that a plaintiff's likelihood of success on the merits is a "very, very strong factor" in determining whether to issue a preliminary injunction, and, "if it is probable that the plaintiff would succeed on the merits, it would seem that in and of itself is sufficient reason for issuing the injunction." We think the district court was in error in placing so much emphasis

on the likelihood of success factor. As we have said, in determining whether to grant or deny interlocutory injunctive relief pursuant to FRCP 65(a), the two more important factors are those of likelihood of irreparable harm to the plaintiff without an injunction and of likelihood of harm to the defendant with an injunction. Even where likelihood of irreparable harm to the plaintiff without an injunction may be characterized as simply "possible," likelihood of success on the merits is merely one "strong factor" to be weighed alongside both the likely harm to the defendant if an injunction issues and the public interest.

and thus is in competition with Maryland Undercoating in Portsmouth. We agree with the district court that *First National Bank* and *Schill, supra,* set forth an applicable definition of competition and that, in the instant case, the issue of whether PSC is in competition with Maryland Undercoating in Portsmouth turns on whether PSC is soliciting customers in Portsmouth, some of whom may be current or potential customers of Maryland Undercoating. However, we think the court below erred in concluding that based upon the evidence of record PSC is presently soliciting customers in Portsmouth and thus is in competition with Maryland Undercoating in that locale.

The district court pointed to the fact that PSC is currently servicing the Ford Fiesta account, an account that constituted approximately sixty to seventy percent of Maryland Undercoating's business prior to Ford's termination of its agreement with Maryland Undercoating, as evidence that PSC is soliciting customers in Portsmouth and thus is in competition with Maryland Undercoating. PSC is a wholly owned subsidiary of Ford. According to the testimony of Petro, operations manager at PSC's Portsmouth facility, the function of PSC is to service Ford's domestic and imported automobiles. Thus, in ports where PSC operates, Ford has its wholly owned subsidiary perform certain services on its automobiles rather than farm those services out for an independent company to perform. In essence, Ford has decided to perform certain services for itself in ports where PSC has established a facility. Nothing in the record indicates that PSC had any latitude in taking on the Ford Fiesta account, and in the absence of any proof we will assume that which is natural and probable, that the parent company simply told the subsidiary

what to do. If PSC does nothing but service Ford vehicles in Portsmouth, it is not there in competition with Maryland Undercoating since Maryland Undercoating is in the business of offering its services to others. *E. L. Conwell and Company v. Gutberlet,* 298 F.Supp. 623, 630 (D.Md.1969), aff'd, 429 F.2d 527 (4th Cir. 1970). The fact that Maryland Undercoating serviced Ford's Fiesta account prior to the time PSC established operations in Portsmouth does not affect this conclusion. See *id.*

It is undisputed that at the present time PSC services only Ford Fiestas at its Portsmouth facility. Petro testified to that effect, as did Robinson, President of Maryland Undercoating. Additionally, there is no evidence in the record that PSC has solicited any customers in the Portsmouth area. Robinson testified that he did not know whether PSC had solicited business from any of Maryland Undercoating's current customers in Portsmouth. And Petro testified that as far as he knew PSC does not solicit business from other automotive companies. Petro also testified that at the present time the PSC facility in Portsmouth is incapable of servicing any account other than the Fiesta account due to space limitations.[14]

The district court pointed to Robinson's and Petro's testimony that PSC's facility in Newark, New Jersey, no longer in operation, had serviced an account other than a Ford account, as evidence that PSC is amenable to soliciting and servicing customers in the Portsmouth area. Both Robinson and Petro testified that PSC's Newark facility serviced vehicles manufactured by Peugeot,[15] an account that Maryland Undercoating is currently servicing in Portsmouth.[16] The court relied, in part, upon

14. Petro did testify that PSC has seen the Portsmouth Marine Terminal about acquiring additional land, but there is no indication as to what use PSC would make of additional land and space.

15. Petro, who was administrative manager of PSC's Newark facility prior to his employment with PSC at its Portsmouth facility, testified that PSC did not solicit the Peugeot account in

Newark. He said that Peugeot was dissatisfied with the service it was receiving in Newark and contacted PSC to see if PSC would service its account. Petro stated he believed PSC there serviced the Peugeot account on a temporary basis to accommodate Peugeot.

16. Maryland Undercoating has never operated a facility in Newark, New Jersey.

this evidence in reaching its conclusion that PSC is in competition with Maryland Undercoating in Portsmouth.

We think the type of operation of PSC in Newark, in the context here, is irrelevant to the determination of whether PSC is presently in competition with Maryland Undercoating in Portsmouth. The non-competition clause in Payne's employment contract is necessarily limited to a specified geographic area.[17] Newark is outside of that geographic area. Thus, Payne would be free to go to work in Newark for a company that is in competition with Maryland Undercoating for similar customers and accounts. The fact that PSC serviced a non-Ford account in Newark, and thereby may have had in Newark an operation that competed with Maryland Undercoating for similar customers, does not lend validity to the court's determination that PSC is in competition with Maryland Undercoating in Portsmouth when the evidence of record establishes that PSC currently services only Ford Fiestas in Portsmouth and has not attempted to solicit any additional customers in Portsmouth.

Despite the dearth of evidence as to PSC's solicitation of customers in Portsmouth, the district court stated, "[t]here is no way of suggesting that . . . Predelivery would not tomorrow or could not tomorrow solicit the very accounts now being serviced by Maryland Undercoating or other customers in the area." Assuming, arguendo, that the district court's statement is correct, the issue is whether PSC is presently in competition with Maryland Undercoating, not whether at some point in the future PSC may become a competitor of Maryland Undercoating.[18] Thus, the district court's reliance on PSC's ability to become a competitor of Maryland Undercoating as evidence that PSC is presently in competition with Maryland Undercoating in Portsmouth was error.[19]

If within the two-year limitation of the non-competition clause PSC should begin to solicit or service non-Ford accounts in the Portsmouth area, Maryland Undercoating would have the right to seek an injunction prohibiting Payne from working for PSC since at that point Payne may be employed by a company that is in competition with Maryland Undercoating in breach of his employment contract. But, at the present time, we think the evidence of record establishes that PSC is not in competition with

---

**17.** The non-competition clause prohibits Payne from engaging in a similar line of business in competition with Maryland Undercoating within a radius of thirty miles of the Dundalk Marine Terminal in Baltimore, Maryland and within a thirty mile radius of the Portsmouth Marine Terminal in Portsmouth, Virginia, for a period of twenty-four months after the termination of his employment with Maryland Undercoating.

**18.** As noted, the non-competition clause in Payne's employment contract prohibits him from engaging in a similar line of business in competition with Maryland Undercoating within a specified geographic area for a specified period of time. The plain language of the clause prohibits Payne from competing with Maryland Undercoating and does not speak to potential or possible future competition.

As indicated in note 5, we think it unlikely that the fact that PSC and Maryland Undercoating may bid for the services of the same employees shows the companies are in competition as that term is used in the employment contract under consideration here.

**19.** When Payne was deposed, he stated that a representative of Eastern Auto Distributors, a present customer of Maryland Undercoating, approached him in June 1978, after he began his employment at PSC, and inquired as to whether he would be interested in handling Eastern Auto's account. Payne stated, "I informed him at that time that we [PSC] did not take on outside accounts other than Ford products." The court pointed to this encounter as evidence that PSC is a potential competitor of Maryland Undercoating. The court stated, "so . . . it's not the question of what has already been done or what's being done today but what can be done tomorrow or next week or next year." We think the district court's statements in this regard illustrate the error it committed in relying on PSC's potential to become a competitor of Maryland Undercoating as evidence that PSC is presently in competition with Maryland Undercoating in Portsmouth. Additionally, to the extent the district court intended to imply Payne could be enjoined from working for a potential competitor of Maryland Undercoating, it was also in error.

Maryland Undercoating in the Portsmouth area.[20]

The order appealed from is

*VACATED.*

WINTER, Circuit Judge, dissenting:

The majority reverses the preliminary injunction granted by the district court (1) for failure properly to apply *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4 Cir. 1977), and (2) because PSC is not in competition with Maryland Undercoating in the Portsmouth area and the district court's finding to the contrary is clearly erroneous and contrary to law. My view is that *Blackwelder* was correctly applied, that PSC is in competition with Maryland Undercoating in the Portsmouth area, and that therefore the district court should be affirmed. I respectfully dissent.

### I.

The district court, as its oral opinion amply demonstrates, was fully aware of *Blackwelder,* as well as the reiteration of its principles in *Fort Sumter Tours v. Andrus,* 564 F.2d 1119 (4 Cir. 1977), including *Blackwelder's* emphasis on the balance-of-hardship test. In applying that test, the district court concluded, correctly in my view, that the significant issue was which of the parties would probably succeed on the merits. Payne voluntarily entered into the restrictive covenant which on its face discloses no apparent illegality; he voluntarily, and indeed surreptitiously, negotiated new. employment with PSC; he voluntarily accepted new employment with PSC. Of course if the restrictive covenant is enforced against him, he will suffer injury in that his employment with PSC will be interrupted. But, unless the covenant is inapplicable, the consequence will be the result of his own acts. "It would seem elementary that a party may not claim equity in his own defaults." *Long v. Robinson,* 432 F.2d 977, 981 (4 Cir. 1970). More importantly, if, when the case is fully tried, it is found that Payne was improperly temporarily enjoined, Payne will not suffer irreparable injury. The bond of Maryland Undercoating which the district court required as a condition precedent to issuance of interim relief will be available to compensate Payne for losses improperly imposed. The district court fixed the bond in an amount to cover Payne's anticipated compensation from PSC, without reduction by interim earnings from other sources, for the period that the district court estimated would be required to achieve a final judgment.

By contrast, if an interim injunction were denied, Maryland Undercoating would suffer irreparable injury. Payne had access to and knowledge of its engineering and technical data, pricing and cost information, personnel matters, and customer relations. Payne was in a position to pass much of this information to PSC and indeed it appears that this process has begun since PSC hired between 12 and 14 of Maryland Undercoating's 27 employees within a few weeks after Payne's employment began.

Thus, I think that, under the balance-of-hardship test, the equities lie with Maryland Undercoating and indicate that interim injunctive relief should be granted, if it is assumed that the restrictive covenant is valid and enforceable. This is why I agree with the district court that the major factor to be considered in determining whether interim injunctive relief should be granted is the probability of how the merits will be finally decided, and I turn to it.

### II.

Payne stipulated the facial legality of the restrictive covenant and correctly so.

---

20. Even the President of Maryland Undercoating, Robinson, admitted that at the present time PSC does not compete with Maryland Undercoating in Portsmouth. In response to the question, "In what way does PSC compete with Maryland Undercoating in Portsmouth?", Robinson replied, "At this time Predelivery Service is not competing with us, but they have the capability." We recognize that Maryland Undercoating is concerned about PSC's potential for becoming a competitor. As previously stated, our opinion does not prevent Maryland Undercoating from enforcing the non-competition clause contained in Payne's employment contract should PSC in fact engage in competition with Maryland Undercoating in Portsmouth.

Whether tested by Maryland or Virginia law, it is reasonable in scope and reasonably limited in duration. *See e. g. Ruhl v. F. A. Bartlett Tree Expert Co.*, 245 Md. 118, 225 A.2d 288 (1967); *Meissel v. Finley*, 198 Va. 577, 95 S.E.2d 186 (1956). Where applicable, it is therefore legally enforceable.

Payne seeks to avoid its application on the ground that PSC and Maryland Undercoating are not in competition. Whether they are or not is a mixed question of fact and of law. As to the factual aspects of the question, I do not think that the district court's findings are clearly erroneous, and I think that its legal conclusions were correct.

As a factual matter, the majority determines that PSC and Maryland Undercoating are not in competition on the basis of PSC's own representations that it has no intention to expand its services at Portsmouth to automobiles other than Ford Fiestas. The objective evidence, however, provides reason to doubt these representations. In employing Payne, PSC described itself as in "an expansionary phase requiring the addition of management personnel" and added that "pending our future expansion activities, we would be overstaffed." A current customer of Maryland Undercoating has approached Payne to inquire about the availability of PSC's services. Although PSC has not yet seen fit to offer its services at Portsmouth to manufacturers other than Ford, this attitude may well change when PSC acquires the additional land that it has sought in Portsmouth. Certainly it offers no explanation of its need for this additional land. It is true that PSC is a wholly-owned subsidiary of Ford, but this subsidiary status did not prevent PSC from servicing Peugeot automobiles in Newark. Even if PSC's Portsmouth facility limited itself to Ford products, it may well decide to service domestically produced Ford trucks, an account which for the moment is still held by Maryland Undercoating. The evidence thus supports the district court's finding that PSC is a competitor of Maryland Undercoating in Portsmouth.

Even if there is some ambiguity about the desire of PSC to expand its operations, to acquire new customers, and thus to compete with Maryland Undercoating with respect to Maryland Undercoating's present customers, there is no such doubt with respect to Maryland Undercoating's competing with PSC. When PSC obtained the Ford Fiesta account at Portsmouth, Maryland Undercoating lost it. Maryland Undercoating is ready, willing and able to resume servicing Fiestas if it could obtain the business. Ford switched its business in Portsmouth to PSC for economic reasons, and presumably it would switch its business back to Maryland Undercoating if that switch were in its economic interest. The majority's conclusion that PSC and Maryland Undercoating are not competitors must certainly come as a surprise to the managers of Maryland Undercoating, who will nevertheless continue their efforts to regain the lost Fiesta business. Unfortunately for Maryland Undercoating, however, it is not likely to be able to underbid PSC, so long as PSC enjoys the services of Payne, who is privy to Maryland Undercoating's pricing and cost data. This is, of course, the very evil that Payne's restrictive covenant with Maryland Undercoating was designed to prevent.

As a legal matter, I believe that the majority has interpreted the term "competition" in an unjustifiably narrow manner. The majority appears to hold that two companies providing the same services in the same geographic area are not in competition simply because they do not share the same customers. This holding is surely contrary to the definition of competition in *First National Bank v. City of Hartford*, 273 U.S. 548, 559, 47 S.Ct. 462, 71 L.Ed. 767 (1927), which the majority quotes and endorses. *See also Schill v. Remington Putnam Book Co.*, 179 Md. 83, 17 A.2d 175 (1941). In many service markets, every customer may decide to give all of his business to a single supplier, but this does not mean that the suppliers are not competitors. If this were an antitrust case involving an agreement between PSC and Maryland Undercoating to fix the prices for services

offered to their respective customers, I am confident that the majority would consider the agreement to be an unlawful restriction of competition. Similarly, if a merger between PSC and Maryland Undercoating were proposed, I have no doubt that the two companies would be considered to be part of the same relevant market for purposes of assessing the anticompetitive effect of the merger. I fail to see why the majority refuses to apply these same concepts of competition in a case involving a covenant in an employment contract. The record is devoid of any evidence that Maryland Undercoating and Payne intended that the word "competition" be used in a sense other than its ordinary one.

The only authority that suggests a contrary conclusion is *E. L. Conwell & Co. v. Gutberlet*, 298 F.Supp. 623 (D.Md.1969), *aff'd per curiam*, 429 F.2d 527 (4 Cir. 1970). There, the district court, in an alternative ground of decision, held that when a certain Gutberlet went to work for a customer of his employer, he did not violate a restrictive covenant because the employer and customer were not in competition, the customer merely doing its own work. But in Conwell the customer employed Gutberlet directly and not through a separate corporation. By contrast, Ford, instead of servicing its own import vehicles, has chosen to do so through PSC, whose separate corporate presence must be respected. *See Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 200 A.2d 166 (1964); *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925). More importantly, our per curiam opinion in *Conwell* affirmed on other grounds and did not mention the no-competition holding of the district court.

I would not follow the alternative holding of the district court in *Conwell* but would rather follow the ordinary concept of "competition." Since PSC and Maryland Undercoating are competitors, Payne breached the restrictive covenant in his employment contract with Maryland Undercoating. I would therefore affirm the district court's issuance of the preliminary injunction against Payne.