The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF MARYLAND

v.

PUBLIC SERVICE COMMISSION OF MARYLAND—Ronald Hawkins, Executive Director, Frank O. Heintz, Chairman, William A. Badger, Commissioner, Lilo K. Schifter, Commissioner, Wayne B. Hamilton, Commissioner, Haskell N. Arnold, Commissioner.

Civ. A. No. N–83–855.

United States District Court, D. Maryland.

April 7, 1983.

J. William Sarver, Baltimore, Md., Mark H. Mathis and D. Michael Stroud, Washington, D.C., and Donald N. Rothman, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., for plaintiff.

Kirk J. Emge, Chief Hearing Examiner of Public Service Commission of Maryland, Baltimore, Md., for defendant.

James H. DeGraffenreidt, Jr., Baltimore, Md., for intervenor, Maryland Office of People's Counsel.

MEMORANDUM

NORTHROP, Senior District Judge.

In this action the plaintiff, Chesapeake and Potomac Telephone Company of Maryland (hereinafter "C & P"), seeks a preliminary injunction preventing the Public Service Commission of Maryland and its executive director and commissioners (hereinafter "PSC") "from the operation, enforcement or execution of that portion of Order No. 66114 of the Maryland Public Service Commission that prevents plaintiff from collecting intrastate charges for telephone services based on depreciation rates prescribed by the Federal Communications Commission." Motion for Preliminary Injunction at 1–2. C & P alleges it is losing $44,000 per day as a result of that Order, causing it to suffer substantial and irreparable harm because regulatory law does not permit retroactive recovery of this revenue. It further contends that in the event the rate increase is later determined to be unjustified, its' customers can be protected through a refund of their excess contribution, with interest. C & P also suggests that a rate change of no more than 2.2% would result in its recovery of this revenue. The Maryland Office of People's Counsel (hereinafter People's Counsel), upon motion to this Court, was granted leave to intervene on April 6, 1983. The People's Counsel joins PSC in all substantive respects.

These proceedings had their genesis in an order of the FCC released January 6, 1983, in which the FCC reconsidered and revised its general position on the rate depreciation system in telecommunications. *See* Uniform System of Accounts, CC Docket No. 79–105, FCC 82–581 ("The Preemption Order") (Attachment A to Complaint). Today, it is the FCC's position that Section 220 of the Communications Act, 47 U.S.C. § 220, permits the FCC to preempt states insofar as the establishment of depreciation expense determinations. *See* Preemption Order at 6. C & P, like other companies in the telecommunications industry, has been prescribed depreciation rates by the FCC

which it intends to utilize. Nevertheless, because the PSC believes the FCC Preemption Order unlawfully infringes upon the State of Maryland's authority to set its own intrastate rates, it has declined to abide by the new FCC formula. *See* Order No. 66114 at 12–18 (entered Feb. 18, 1983) (Attachment B to Complaint). The PSC suggests "the depreciation practices established by the FCC in no way limit this Commission's authority to determine the appropriate level of depreciation expense to be reflected in intrastate rates for telephone service." *Id.* at 18.

### *Subject Matter Jurisdiction*

Initially, the PSC opposes the plaintiff's request for a preliminary injunction on the grounds that this Court lacks subject matter jurisdiction. Memorandum of Law of Public Service Commission of Maryland in Opposition to plaintiff's Motion for Preliminary Injunction (hereinafter "Opposition") at 4–15. C & P disagrees and contends Section 401(b) of the Communications Act, 47 U.S.C. § 401(b), confers jurisdiction upon this Court. That section reads as follows:

(b) If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

The PSC objects to the applicability of that statute by emphasizing the statutory reference to failure or neglect of any "person" to obey any order of the FCC. *See*

Opposition at 8–9. In the Communications Act, "person" includes "an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(i). "State Commission" is defined separately, *see id.* § 153(t), and the PSC argues it is therefore not included in the definition of "person." *See id.* § 153(i).

Within the past month, another court faced and rejected this very argument. *See Pacific Northwest Bell Telephone Co. (PNB) v. Washington Utilities and Transportation Commission (WUTC),* No. C83–214C (W.D.Wash. March 10, 1983) (hereinafter "PNB v. WUTC"). It held:

47 U.S.C. § 401 provides the only means through which the FCC or a private party can seek the enforcement of a valid FCC order or provision (There are some additional provisions elsewhere in the statute which specifically address the enforcement of orders against carriers by the FCC). §§ 401(a) and (c) are directed to the prosecution of violations of *provisions* of the chapter by the FCC and § 401(b) is directed to enforcement of FCC *orders*. Since § 401(b) is the only method by which anyone, including the FCC, could secure enforcement of its orders, the Court is inclined to believe that Congress intended this provision to apply to all violations. Although the Court recognizes the fact that Congress was very sensitive to the delicate balance of power as between the FCC and state commissions in the area of regulating communications, the Court believes that Congress addressed these concerns by providing ample provision for review of FCC orders. Congress could hardly have intended to allow a state commission to refuse the opportunity to seek review of a FCC order on the grounds that it was not a "person" within the meaning of the enforcement section of the statute.

Rather, this Court finds that Congress intended FCC orders to be enforceable until suspended through proper process (§ 408). Further, the Court finds that there is no rational basis for excluding state commissions from the group of persons against whom enforcement may be

sought since they clearly have the same opportunity as any other person to seek review and suspension of orders with which they disagree.

Thus, the Court finds that there is jurisdiction under 47 U.S.C. § 401(b).

▮ This Court likewise finds that a state commission is a person within the meaning of § 401(b). Accordingly, PSC's first jurisdictional argument must be rejected.

▮ The second basis for PSC's challenge to this Court's subject matter jurisdiction is the Johnson Act, 28 U.S.C. § 1342. *See* Opposition at 10–15. It reads:

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; *and,*

(2) The order does not interfere with interstate commerce; *and,*

(3) The order has been made after reasonable notice and hearing; *and,*

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

(Emphasis added). This Court has just held that jurisdiction may be predicated upon § 401(b). This Court therefore has federal question jurisdiction. Jurisdiction is not based solely on diversity of citizenship or repugnance of the order to the Federal Constitution. Accordingly, the Johnson Act does not preclude subject matter jurisdiction here.

### Preliminary Injunction Standards

In determining the propriety of a preliminary injunction in this case, the parties have agreed that the proper standard is the test articulated in *Blackwelder Furniture Company v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir.1977). The factors of that test are as follows:

(1) the likelihood of irreparable harm to the company without the preliminary injunction;

(2) the likelihood that other parties will be irreparably harmed if an injunction is issued;

(3) the company's likelihood of success on the merits; and

(4) the public interest.

The first step, of course, is for the Court to balance the likelihood of irreparable harm to the plaintiff without an injunction against the likelihood of harm to the defendant with an injunction. *Maryland Undercoating Company, Inc. v. Payne,* 603 F.2d 477 (4th Cir.1979). "If a decided imbalance of hardship should appear in the plaintiff's favor, it is enough that grave or serious questions are presented; plaintiff need not show a likelihood of success on the merits. The need for plaintiff to show likelihood of success on the merits increases as the probability of irreparable injury without an injunction decreases." *Id.* Finally, the public interest must be considered.

In *PNB v. WUTC, supra,* the Washington court noted that prior to consideration of these four factors, the court must determine whether the statutory preconditions of injunctive relief have been met. *See* slip op. at 9–10. Section 401(b) provides in pertinent part:

If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process
. . . .

The court found that there was no dispute that the Preemption Order at issue, the same order at issue in this case, was regularly made and that WUTC was duly served with a copy of the order. Slip op. at 9.

The Washington court then rejected WUTC's argument that it had not violated the Preemption Order because the order had not told it to do anything. *See* slip op. at 9. Like the PSC, WUTC contended that the Order did not limit its authority to

determine depreciation expense. *See id.* at 9–10. The court also stated that the issue of FCC authority to preempt the entire field of depreciation charges was not before it because that issue was not subject to review in the district court. *See id.* at 10.

After making these preliminary determinations, the court held that a preliminary injunction was appropriate. It based its holding on a finding that PNB was forced to forego substantial revenues to offset expenses and that PNB could not retroactively recapture these revenues if it ultimately prevailed. The court noted that in the event PNB did not prevail, the rate increase could be refunded. *See id.* at 10.

Although the Washington Court found that the Preemption Order was "regularly made," the PSC and the People's Counsel suggest that the order presently at issue was not regularly made because the FCC was without authority. *See* Opposition at 29; Memorandum of Maryland Office of People's Counsel in Opposition to Motion for Preliminary Injunction (hereinafter cited as "Opp. of People's Counsel") at 14–15. It is more likely, however, that the term "regularly made" refers to procedural regularity because jurisdiction over the issue of the validity of an FCC Order is vested exclusively in the Court of Appeals. *See* 28 U.S.C. § 2342(1). Procedural regularity has not been challenged.

Like the Washington Court, this Court must consider irreparable injury to the utility if a preliminary injunction is not granted. C & P alleges that for this rate year alone, it will lose $16.1 million in revenues if the PSC does not follow the FCC mandated depreciation standard. C & P further alleges that under Maryland law there is no statutory device through which it could retroactively recover revenues after a determination in its favor. The PSC, along with courts in other jurisdictions, has refused to allow such a retroactive recovery. *See* C & P's Memo at 6–8.

Therefore, in the absence of a showing that some other remedy is available which can safeguard this FCC mandated depreciation entitlement, this Court has no choice but to find C & P will suffer irreparable harm in the absence of an injunction. The People's Counsel's and the PSC's argument that this Court retains the equitable power to order the PSC to reimburse C & P through retroactive compensation must be rejected, as it is nothing more than an attempt to have this Court order the PSC to do what the legislature forbids.

Besides considering the harm to C & P if this preliminary injunction is not granted, the Court must also consider the harm other parties might suffer if the preliminary injunction is granted. In particular, the Court is concerned about the impact an injunction would have on the residents of Maryland. The PSC and the People's Counsel suggest that any increase, no matter how small, may cause some consumers to give up their phone service or forego the opportunity to acquire phone service, and thereby jeopardize their rapid access to emergency health services and police and fire protection. Inasmuch as the requested increase roughly translates into a penny per day, I find that argument untenable. No reasonable person will terminate their utility service for that amount of money.

Moreover, in the event the United States Court of Appeals for the Fourth Circuit rules the FCC exceeded its power in establishing uniform accounting principles, C & P has agreed to return all excess monies paid to its customers, with interest. The formula for that rebate would likely amortize the return over a reasonable period and should permit those individuals who paid the increased rate, but who subsequently terminated their telephone service, the opportunity to individually petition C & P for their refund.

As to the People's Counsel's suggestion that because the appellate process is unlikely to produce a definitive resolution of this issue before the divestiture is implemented, C & P will be left to make the refunds after having transferred away at below book value assets which enabled AT & T to benefit from the accelerated depreciation and, under these circumstances, to the extent that the refund obligation proves burdensome to

C & P, that burden could ultimately flow through to C & P ratepayers unless AT & T is somehow held responsible after divestiture along with C & P, Opposition of People's Counsel at 11–12, that is an accounting problem better left to C & P and the PSC. Furthermore, because the argument is speculative in nature, it cannot stand in the way of the injunctive relief requested.

On the issue of "public interest," this Court finds it in the public interest that the Congressional mandate that there be a nationwide uniformity in telecommunications policy be followed. To bifurcate that interest further, so as to accept the PSC's argument that the residents of Maryland have a separate overriding concern beyond the national interest would be to view the concept of public interest too narrowly.

Finally, the fourth factor which the Court must consider is whether C & P has demonstrated a likelihood of success on the merits. Exclusive jurisdiction over this issue has been vested in the United States Court of Appeals. *See* 28 U.S.C. § 2342(1); *City of Peoria v. General Electric Cablevision Corp.,* 690 F.2d 116, 119 (7th Cir.1982). In fact, the issue is presently before the Fourth Circuit due to a suit filed by the Virginia utilities commission. *See Virginia State Corp. Comm'n. v. FCC,* No. 83–1136 (4th Cir., filed Feb. 11, 1983). Nevertheless, for the purposes of this decision, this Court must independently consider the issue.

In recent years, two separate panels of the Fourth Circuit upheld an FCC program of registration of telephone equipment used for both interstate and intrastate communications. *See North Carolina Utilities Commission v. FCC,* 537 F.2d 787 (4th Cir.1976), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976) (hereinafter cited as *NCUC I*); *North Carolina Utilities Commission v. FCC,* 552 F.2d 1036 (4th Cir. 1977), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). The Fourth Circuit approvingly cited Chief Justice Burger's admonition that:

> the Communications "Act must be construed in light of the needs for comprehensive regulation and the practical difficulties inhering in state by state regulation of parts of an organic whole."

*NCUC I, supra,* at 795–96. The PSC does not dispute that the telephone plant to be depreciated is used to provide both interstate and intrastate service. *See* Opposition. Accordingly, the Court finds there is a strong likelihood that the Fourth Circuit will uphold the Preemption Order.

For these reasons, a preliminary injunction should issue against the defendants requiring them to abide by the FCC's January 6, 1983 Order regarding depreciation rates and methodologies. This Court will not, however, accept C & P's conclusory averment that it is entitled to an automatic 2.2% rate increase. The PSC, not the Court, has the expertise in this area and will accordingly be required to issue an order within 10 days which provides for the collection of rates by C & P sufficient to recover the intrastate revenue requirement as established by the FCC.

These rates will be subject to reasonable refund provisions as the PSC may authorize should C & P not prevail on the merits of this case. Finally, such refund provisions must include provisions to make refunds to those C & P customers who terminate service with C & P during the effective dates of the injunction.