## FOOD FAIR STORES, INC. ET AL. *v.* GREELEY

[No. 169, September Term, 1971.]

*Decided January 12, 1972.*

106

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Marvin I. Singer,* with whom were *Sullivan, Wiesand & Singer* on the brief, for appellants.

*Lawrence F. Weslock* for appellee.

FINAN, J., delivered the opinion of the Court.

Carl E. Greeley (Greeley), the appellee, a former employee of Food Fair Stores, Inc. (Food Fair), appellant, and a beneficiary under its corporate Pension Plan (Plan), originated these proceedings. He terminated his employment to accept a position in a competitive field and when the funds which he felt were due him under the Plan were not forthcoming, sued both Food Fair and the Trustee of the pension fund. We must now determine what his rights may be under the Plan which imposes upon former employees certain restrictive conditions, regarding activity in competition with Food Fair or inimical to its interest, the breach of which is to be determined by an Advisory Committee (Committee).

108

On January 26, 1970, Greeley voluntarily terminated nearly 15 years of employment with Food Fair, a retail grocery store chain based in the State of Pennsylvania, to accept a position of "retail counselor" with the Fox Grocery Company, a wholesale grocery firm. During the course of his employment with Food Fair, the appellee held the position of manager-trainee and eventually store manager, working in the Baltimore metropolitan area. As a "retail counselor" with the Fox Grocery Company, the appellee's duties included selling a line of groceries similar to that sold by Food Fair to independent retail grocers in the Baltimore area and advising the independent grocers in ways to increase their sales.

After 5 years of employment with Food Fair, the appellee became a participant in the company's noncontributory Incentive Bonus and Retirement Plan (Plan) which is maintained for the executive, administrative, and supervisory personnel of the company and for which the other appellant in this case, The First Pennsylvania Banking and Trust Company (First Pennsylvania), acts as Trustee. The Plan is funded entirely from the profits of Food Fair, and in addition to providing retirement benefits, it supplies insurance protection in the event of the death of an employee. The Plan provides that upon the voluntary resignation of a participant, distribution is not to be made until the employee reaches the age of 65 or dies, whichever is the first to occur, and it further stipulates that distribution is subject to the conditions imposed upon post-employment conduct which are contained in Section 7.1, which states:

> "If the Committee [the advisory body established to administer the Plan] determines in its sole and absolute discretion that a Participant has engaged in fraud or dishonesty towards the Company, or has intentionally damaged the Company's property, or has wrongfully disclosed any secret process or imparted any confidential information, or has done any act inimical to the interest of the Company during his

employment or thereafter, such as engaging in a competing business or entering the employ of a competitor of the Company, the Committee shall have the full right and power to suspend, reduce, terminate or forfeit the benefits or interest of such Participant (or his Beneficiary) in the Plan, whether or not vested."

After Greeley left the employ of Food Fair to accept the position with the Fox Company, he made claim for the monies allegedly due him pursuant to the terms of the Plan. The Plan's Advisory Committee responded to the claim by citing Section 7.1, presumably taking the position that by working for the Fox Company as a "retail counselor," Greeley had forfeited the Plan's benefits. Greeley thereafter instituted suit against Food Fair and First Pennsylvania (as Trustee of the Plan's funds) in the Circuit Court for Prince George's County seeking the proceeds of the Plan's benefits and additionally seeking from Food Fair a bonus and accrued vacation pay allegedly due him.

First Pennsylvania, which is chartered under the laws of Pennsylvania, filed a motion raising a preliminary objection in the lower court which questioned the presence of jurisdiction over it by the Maryland Courts. The motion was overruled after a hearing before Judge DeBlasis, and a subsequent demurrer questioning the sufficiency of the allegations made against First Pennsylvania was also overruled by Judge DeBlasis.

The case was heard on its merits, Meloy, J. presiding, on April 13, 1971, at which time the appellants strenuously argued that the action of the appellee in working for a "competing business," combined with the fact that the appellee had played some part in leading another Food Fair employee, Gordon Lee Malone, away from his Food Fair position to one with the Fox Company, constituted a violation of Section 7.1 of the Plan and therefore made Greeley ineligible to receive the Plan's benefits. At the conclusion of arguments, however, the court

awarded a judgment against both Food Fair and First Pennsylvania in the amount of $8,514.10 representing the sum of money to which Greeley was entitled under the Plan. The court found in favor of Food Fair as to Greeley's claim for a bonus and accrued vacation pay. Food Fair and First Pennsylvania now appeal the judgment entered against them.

*In limine*, there is the juridictional question which must be disposed of regarding the appellant, First Pennsylvania. It contends that as a foreign corporation it is not amenable to the jurisdiction of the Maryland Courts because it is not doing business in Maryland, nor do any of its general activities or those in relation to the plaintiff Greeley constitute a presence within the State or sufficient contacts within this State, to bring it within the purview of Maryland Code (1969 Repl. Vol.), Art. 75, § 96, commonly referred to as our "Long Arm" statute. While recognizing the liberal construction we have given to this statute in the recent cases of *Harris v. Arlen Properties Inc.*, 256 Md. 185, 195, 196, 260 A. 2d 22 (1969), and *Novack v. National Hot Rod Assn.*, 247 Md. 350, 354, 231 A. 2d 22 (1967), we find nothing in the record in the instant case which would bring First Pennsylvania's activities or its duties as Trustee under the Plan within the scope of the "Long Arm" statute as interpreted by our decisions.

The record contains no suggestion that the Plan was negotiated, executed, or implemented within this State. Communications regarding the Plan and the statements of Greeley's account came through the mail from Food Fair. Upon the termination of his employment Greeley wrote to the "retirement committee" inquiring as to his status under the Plan and in reply he received a letter from the employees' representative for the Advisory Committee, but there is no evidence that the Trustee was involved in the denial of the claim. In short, we are unable to find any minimal contacts within the due process requirements, on the part of First Pennsylvania, found to be a requisite for jurisdiction in *International Shoe*

*Company v. State of Washington,* 326 U. S. 310, 316 (1945), or acts of the Trustee of a purposeful nature in this State or a persistent course of business activity in this State. *Vitro Electronics v. Milgray,* 255 Md. 498, 505, 258 A. 2d 749 (1969). Were we to hold the Trustee amenable to jurisdiction we think it would violate the "traditional notions of fair play and substantial justice," articulated in *International Shoe, supra,* at 316. See also Auerbach, *The Long Arm Comes to Maryland,* 26 Md. L. Rev. 13, 25 (1966). Accordingly, we are of the opinion that the lower court erred in rendering a judgment against First Pennsylvania and reverse the judgment below as to that defendant. We would further add that we do not view the lack of a judgment against First Pennsylvania as any real detriment to Greeley's obtaining his just rights, as we are of the belief that Food Fair is in a position to legitimately instruct the Advisory Committee to direct the Trustee to comply with any judgment entered against Food Fair, the satisfaction of which lies in a payment from the pension fund.

Turning to the judgment against Food Fair we must first examine the structure of the Advisory Committee, and next, its actions in applying the provisions of Section 7.1 of the Plan to the conduct of Greeley. In this latter connection we must also examine the language of Section 7.1 itself. Section 2.1 provides that the Committee shall be composed of five members, three to be appointed by the board of directors of Food Fair and two to be elected from the participants in the Plan. Section 2.1 further provides that, "No Advisor shall be liable to any person whatsoever by his having acted as Advisor." Section 2.2 provides that the board of directors of Food Fair, "shall have the right to discharge any Advisor appointed by it, without assigning any reason therefore." Section 3.9 states that the Committee may discontinue the Plan, should the board of directors of Food Fair deem it advisable. Section 7.6 again reiterates that the board of directors of Food Fair may discontinue the Plan at any time. Section 7.9 provides that Food Fair "may, before making

any distributions hereunder to the Participant or his Beneficiaries, set off against such distribution the amount of any indebtedness of the Participant to the Company."

It should be noted at this point, that Greeley did not join the Committee as a party defendant. What may have been the legal implications of his failure to do this was not argued below nor on appeal. Nor did Food Fair in denying its liability contend that the wrong party had been sued or that it was not a proper party, so in that sense, the question of Food Fair's insulation from liability is not before us. Maryland Rule 885. In fact, in contesting the validity of the monetary judgment obtained against it, Food Fair's main argument, over and above its objections to the lower court's interpretation of the restrictive covenants, was that the judgment of the court accelerated the payment of the employee's benefits and that such a precedent would create an inducement for other employees to resign their positions with Food Fair and thus obtain immediate lump sum payments.

At this juncture we must assess just what responsibility, if any, evolves on Food Fair in connection with the administration of the Plan. In this connection it should be noted that Section 7.8 of the Plan provides that an "employee shall not subject the Company and/or the Committee and/or the individual Advisor and/or the Trustee to any suit or litigation or any legal liability for any reason or cause or thing whatsoever in connection with the Plan; each such employee, for himself, his heirs, executors and administrators does hereby release the Company and the Committee and the Trustee from any and all such liability and obligations." Taken literally, the Plan leaves an employee defenseless and without remedy against anyone who might have, by capricious or arbitrary action, or by fraud, deprived him of his just rights under the Plan. For such an interpretation to be given the sanction or approval by any court would be unconscionable, as was stated in *Siegel v. First Pennsylvania Banking and Trust Company*, 201 F. Supp. 664, 670 (E.

D. Pa. 1961), concerning an almost identical provision in a Food Fair pension plan which was the subject of litigation before that court:

> "Were we to adopt defendants' construction * * *, we would, in effect, set at naught our conclusion that the Plan is a contract and not a gratuity. To hold (as we do) that plaintiff has contractual rights but has no means of enforcing them would not only be inconsistent but futile. A right without a remedy is no right at all: cf. *Woods v. Interstate Realty Co.*, 1949, 337 U. S. 535, 69 S. Ct. 1235, 93 L. Ed. 1524."

It is our opinion that Food Fair, by its right to select a majority of the members of the Committee, by its ability to discharge a member of the Committee appointed by it at any time without assigning a reason, by its ability to terminate the Plan at will and by its right to have any monies owed to it by an employee first deducted before any distribution is made under the Plan to the employee or his beneficiaries, retains sufficient control over the Plan and the Committee to render itself liable to suit for capricious, arbitrary or illegal action on the part of the Committee. The majority of the Committee are representatives of Food Fair and in a practical sense there is a sufficient control over them by Food Fair as to render them its agents. Accordingly, we are of the opinion that Food Fair is in a position to have the Committee direct the Trustee to pay any judgment obtained by an employee against it, resulting from the withholding of funds due an employee under the Plan, and for which funds are available under the Plan.

We further believe that the decision in this case will not cause any deluge of resignations by employees seeking to obtain immediate lump sum payments from the pension fund. In the instant case, had the Committee simply advised Greeley that his benefits would be paid to him when he reached 65 years of age or to his beneficiaries were he to die before that time, he would have had

no cause of action and no benefits would have been immediately payable to him.

Passing on to the consideration of the actions of the Committee with reference to Section 7.1, as applied to Greeley, we find that in its letter of March 9, 1971, it informed him of the resolution which it has passed denying him any benefits under the Plan. The Committee did not assign any specific reasons for its action but contented itself with a general reference to Section 7.1 of the Plan, which we have heretofore set forth, and which contains the restrictive conditions on employees' actions, a violation of which may, in the sole discretion of the Advisory Committee, justify a forfeiture of the employee's pension benefits. From the briefs filed by counsel for Food Fair and from the opinion of the lower court, we can only assume, and we believe reasonably so, that the basis for the Advisory Committee's action was a finding by it that Greeley's conduct violated the conditions of Section 7.1 in that his accepting the position with Fox Grocery breached the provisions against competing and working for a competitor and his further action of informing a food store manager of an opening with Fox Grocery, which was successfully pursued by the store manager, was an act inimical to Food Fair's interests. Certainly the argument of counsel on both sides of this case were structured around these issues.

Food Fair would contend that neither the language of Section 7.1 of the Plan nor its application to Greeley, on the facts of this case, constitute an unreasonable or invalid restraint of an employee. It posits that the Plan itself contains no unreasonable restrictions against competition and is a binding contractual obligation, citing an impressive array of cases garnered from Professor Blake's article, *Employee Agreements Not to Compete,* 73 Harvard Law Rev. 625 (1960), which traces the development of the law in this area from *Mitchel v. Reynolds,* 1 P. Wms. 181, 24 Eng. Rep. 347 (Q.B. 1711) to contemporary times. See also the comprehensive treatment given this subject in 41 A.L.R.2d 15 (1955) and 43

A.L.R.2d 94 (1955). However, we deem it sufficient for the purpose of the instant case to review the statements of Judge Oppenheimer, writing for this Court in *Ruhl v. F. A. Bartlett Tree Expert Co.,* 245 Md. 118, 225 A. 2d 288 (1967):

> "This Court has had a number of cases involving the validity of restrictive covenants in a contract of employment. Covenants of this nature are in restraint of trade; the test is whether the particular restraint is reasonable on the specific facts. The general rule in Maryland, as in most jurisdictions, is that 'restrictive covenants in a contract of employment, by which an employee as a part of his agreement undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." ' *MacIntosh v. Brunswick Corp.,* 241 Md. 24, 31, 215 A. 2d 222 (1965). See also *Silver v. Goldberger,* 231 Md. 1, 6, 188 A. 2d 155 (1963) and cases therein cited; *Restatement, Contracts,* §§ 515, 516 (f)."
>
> * * *
>
> "* * * There is no arbitrary yardstick as to what protection of the business of the employer is reasonably necessary, no categorical measurement of what constitutes undue hardship on the employee, no precise scales to weigh the interest of the public. The decisions in this State and in other jurisdictions are helpful, but, as in so many other fields of the law, the determination must be made on the particular circumstances."
>
> * * *
>
> "Even though the employer has a legitimate

interest in the protection of its clientele, the restrictive covenant will not be enforced if under all the circumstances the covenant is unduly restrictive of the employee's freedom. '[T]he right to labor or use one's skill, talents, or experience for one's own benefit, or furnish them to another for compensation, is a natural and inherent right of the individual * * *' *Deuerling v. City Baking Co., supra,* 155 Md. at 284." 245 Md. at 123, 124, 126.

See also *Tuttle v. Riggs-Warfield-Roloson,* 251 Md. 45, 49, 246, A. 2d 588 (1968) and *E. L. Conwell & Co. v. Gutberlet,* 298 F. Supp. 623 (D. Md. 1969).

We recognize that the Plan, as a contract, does not restrain Greeley's rights to future employment in the sense that it does not present the classic situation wherein the employee, by assuming a position in a competitive field exposes himself to a suit by the employer for breach of contract or by way of a bill for injunctive relief. Here, Greeley is free to engage in competition without restraint or interference by Food Fair, but he is not free to do so and receive the benefits of the Plan. There are jurisdictions which appear to hold the employee to a rather rigid contractual interpretation. See *O'Madigan v. General Motors Corp.,* 202 F. Supp. 190 (E. D. Mo. 1961), aff. 312 F. 2d 250 (8th Cir. 1963) ; *Brown Stove Works v. Kimsey,* 167 S.E.2d 693 (Ga. 1969) ; *Flynn v. Murphy,* 215 N.E.2d 109 (Mass. 1966) ; *Van Pelt v. Berefco, Inc.,* 208 N.E.2d 858 (Ill. 1965) ; *Molburg v. Hunter Hosiery, Inc.,* 158 A. 2d 288 (N. H. 1960) ; *Kristt v. Whelan,* 164 N.Y.S.2d 239 (1957), aff. 181 N.Y.S.2d 205 (1958). However, one cannot gainsay the fact, that whether the restraint on the employee is by way of an employment contract arming the employer with legal sanctions or by virtue of a pension plan, which holds over the employee the loss of benefits should he compete, in either instance, the employee is subject to an economic loss should he breach the restrictive covenant. Therefore, in assessing

the restrictive features of Section 7.1 of the Plan in relation to the position of the respective parties, we do so in light of our decisions in *Ruhl v. Bartlett Tree Co., supra,* and cases cited therein. The principle that the reasonableness of the restriction must be taken into consideration not only regarding restrictive covenants in an employment contract, but in a pension plan, as well, has found recent support in *W. L. Rochester, Jr. v. The Rochester Corp.,* 316 F. Supp. 139, 141 (E. D. Va. 1970). In that case the employee entered into a business directly competitive with that of his former employer, whereas, in the case at bar the competitive impact was not direct; nonetheless, the court stated:

> "Forfeiture clauses should be strictly and narrowly construed—The forfeiture of the right to work is to be voided whenever the Court can discern a rational basis for that result.
>
> It is well settled in Virginia that restrictions in a covenant against competition must be reasonable as to both time and geographical area in relation to the employer's interest to be protected as well as not having an unduly harsh impact on one's opportunity to continue his livelihood. Both are unreasonable in this case."

The record in the instant case clearly shows that the primary business of Food Fair, and its subsidiary Pantry Pride, is that of operating a chain of retail grocery stores and supermarkets. Food Fair is in fact one of the largest retail grocery chains in the nation. The evidence also discloses that Greeley, upon leaving Food Fair, became employed by Fox Grocery Company, a wholesale food broker, whose customers were not individuals but retail food stores. As such, Fox Grocery was not in direct competition with Food Fair, as the latter is not engaged in the wholesale grocery business. It may be said that Greeley's activity, at most, would be of assistance to those competing with Food Fair. However, there were no opportunities for Greeley to solicit the individual cus-

tomers of Food Fair for Fox Grocery and only indirect opportunity for him to solicit customers of Food Fair for the retail stores which were customers of Fox Grocery. In *Ruhl v. Bartlett Tree Co., supra,* at 125, we noted, after quoting *Silver v. Goldberger,* 231 Md. 1, 8, 188 A. 2d 155 (1963), "* * * In all these cases, on varying facts, it is the extent and importance of the personal contact of the employee with the customers to which the Court has looked as largely determining whether the restraint is a reasonable one for the protection of the employer's business." 245 Md. at 125.

The record further reveals that the effort of Greeley in his new position with Fox Grocery creates little, if any, hardship on Food Fair, while, conversely, when we consider Greeley's situation, it would be an undue hardship on him, in comparison to the benefit to be gained by Food Fair, to restrain him from following the vocation for which some 23 years in the grocery business has fitted him. The evidence `shows that he has worked in the grocery business since his early teens and has progressively passed through all phases of grocery store management.

Food Fair endeavored to prove that Greeley was possessed of certain trade secrets and with a particular expertise learned through his association with it, which would be of great value to a competitor and the revealing of which would give Food Fair's competitors an unfair advantage. However, this evidence did not measure up to more than a recognition that through the years of working in the grocery business, including his 15 years with Food Fair, Greeley had become a seasoned and experienced store manager, possessed of the ordinary knowledge with which such experience should endow him.

Without reviewing in further detail the language of Section 7.1, in addition to what we have already said regarding the relative hardship placed on the parties, we would note that the provisions as to the restriction placed on an employee who leaves the employment of Food Fair from engaging in a competing business or from working

for a competitor, contains no limitation as to area or duration of time. This, in itself, runs counter to what we stated in *Ruhl v. Bartlett Tree Co., supra,* at 123, regarding valid restrictions on employment. See also *Conwell & Co. v. Gutberlet, supra,* at 630, and *Rochester, Jr. v. Rochester Corp., supra,* at 141.

However, aside from the impermissibly broad scope of the restrictions against competition found in the Plan, we think our decision must turn upon the application of these restrictions to the employee, in the context of the facts in this case. It is on this basis that we have no difficulty in holding that the restrictions in Section 7.1 regarding competition, as applied to Greeley, constituted an invalid restraint upon his right to earn a livelihood. In this regard, the conclusion of Judge Meloy below, that the restraint on competition was unreasonable and illegal, should be upheld.

Food Fair also infers that Greeley, after leaving its employ, acted inimically to its interests by recruiting Gordon Lee Malone, one of its experienced managers, for Fox Grocery. However, a review of the only testimony on this point shows that Greeley did little more than inform Malone that a vacancy for a retail counselor existed at Fox. Certainly, one could not reasonably argue that this action amounted to such disloyalty or inimical action to Food Fair as to justify a forfeiture of pension benefits.

Finally, while it is true that any employee who voluntarily terminates his services with Food Fair would not be eligible to receive payment of his benefits until he reached 65 years of age (prescinding from the fact that were he to die before that event, his heirs would receive benefits), in the case at bar, where the Committee wrongfully withheld the benefits, we think Greeley became entitled to immediate payment. We say this because it is our belief that the withholding of the benefits by the Committee and its Resolution passed March 2, 1970, whereby it transferred the assets in Greeley's account "to the remaining participants," thus commingling his allocated assets with the general fund, amounted to a con-

version of the assets which entitled him to the immediate recovery of their value. In *Shipley v. Meadowbrook Club,* 211 Md. 142, 126 A. 2d 288 (1956), this Court was presented with a situation wherein one Shipley, an employee of Meadowbrook Club, Inc., in addition to his regular annual compensation, was promised a share of stock for each year that he remained an employee. Shipley also borrowed money from the corporation. After four years there was a parting of the ways between Shipley and Meadowbrook and the latter withheld the promised shares from Shipley. In a suit brought by Shipley to obtain the four shares of stock, Meadowbrook, in addition to filing a general issue plea, interposed two counterclaims. The main issue on the merits of the case was the defense of disloyalty on the part of Shipley, raised by Meadowbrook. The Court while affirming the judgment below in favor of Shipley, opened the judgment and entered one for a higher amount to cover the value of the four shares of stock. We think the following language used by Henderson, J., later Chief Judge, writing for the Court, to be quite apposite:

> "The appellant contends, and the trial court found, that the refusal to issue the four shares of preferred stock amounted to a conversion for which an action of trover will lie. It is well settled that a *chose in action,* including a stock certificate, may be the subject of a conversion, as well as personal property. *Poe, Pleading* (5th ed.), § 207; *Brown v. Bokee,* 53 Md. 155. In *Jones v. Ortel,* 114 Md. 205, an action of trover for the conversion of forty shares of stock, it was held that the action would lie without nice distinctions between the stock itself and the certificate which evidences it. In the instant case, however, no certificate was ever issued for the four shares in question. It has been held, in one case at least, that trover will not lie for a failure to issue stock pursuant to agreement, the remedy being in assumpsit. *Osborn v. Chandeysson*

*Electric Co.,* 248 S. W. 2d 657 (Mo.). Of course, damages might be recovered in equity, as an alternative to specific performance. *Real Estate Trust Co. v. Bird,* 90 Md. 229. The point is not material, however, since in *Balt. City Pass. R. R. Co. v. Sewell,* 35 Md. 238, 258, an action of assumpsit for failure to issue stock, it was held that the plaintiff could recover not only the value of the stock at the time of the demand, with interest, but also any dividends that may have accrued prior to the demand." 211 Md. at 150-151.

It is our opinion that under the facts of the present case, when the conversion took place, a debtor-creditor relationship came into being between Food Fair and Greeley.

For the reasons we have stated we reverse the judgment entered against First Pennsylvania, but think Judge Maloy correctly entered judgment against Food Fair.

> *Judgment against The First Pennsylvania Banking and Trust Company reversed; judgment against F o o d Fair Stores, Inc. affirmed, appellant Food Fair Stores, Inc. to pay costs.*