**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1769

ALLEGIS GROUP, INC.; AEROTEK, INC.; TEKSYSTEMS, INC.,

        Plaintiffs - Appellees,

      v.

JUSTIN JORDAN; DANIEL CURRAN; MICHAEL NICHOLAS; CHRIS HADLEY,

        Defendants - Appellants,

    and

ANA NETO RODRIGUES, ALEXANDER FERRELLO,

        Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, District Judge. (1:12-cv-02535-GLR)

Argued: October 29, 2019              Decided: February 27, 2020

Before WILKINSON, NIEMEYER, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson joined. Judge Diaz wrote a dissenting opinion.

**ARGUED:** Michael James Tuteur, FOLEY & LARDNER LLP, Boston, Massachusetts, for Appellants. Jacqueline Carol Johnson, LITTLER MENDELSON, P.C., Dallas, Texas,

for Appellees.  **ON BRIEF:**  Donald W. Schroeder, Michael Thompson, Boston, Massachusetts, Jillian M. Collins, FOLEY & LARDNER LLP, Washington, D.C., for Appellants.  Paul J. Kennedy, Steven E. Kaplan, LITTLER MENDELSON, P.C., Washington, D.C., for Appellees.

_____

NIEMEYER, Circuit Judge:

This case centers on a corporate "Incentive Investment Plan" created by Allegis Group, Inc., "to promote the long-term economic growth of [Allegis and its subsidiaries]." Under the terms of the Plan, highly compensated employees who qualify for and elect to participate in the Plan can receive incentive payments for 30 months following their separation from service, provided that they remain loyal to Allegis and its subsidiaries and supportive of the companies' business growth. Specifically, during the 30-month period, participating employees are required to refrain from competing with, soliciting customers of, or raiding employees from any Allegis company. The Plan provides that participating employees who fail to satisfy the conditions are not entitled to the incentive payments.

Four former employees of Allegis subsidiary Aerotek, Inc., who as highly compensated employees had elected to participate in the Incentive Plan, either received or expected to receive incentive payments following their separation from service as employees of Aerotek. But before the expiration of the 30-month period, all four decided to form and engage in a competitive business, thus violating the conditions designed to promote the Allegis corporate group's long-term growth.

Allegis and two subsidiaries — Aerotek and TEKsystems, Inc. — commenced this action against the four employees to recoup the incentive payments made to them under the Incentive Plan on the ground that the employees had failed to satisfy the Plan's conditions for payment. In response, the employees sought to establish their right to the incentive payments by arguing that the conditions for payment were legally unenforceable and that, in any event, the companies failed to prove that the employees had breached the

3

conditions. The district court rejected these arguments and, in a summary judgment, ordered the employees to return the incentive payments that they had already received.

On appeal, we conclude that the conditions are enforceable and that the record undisputably shows that the former employees did not comply with them. Given that the employees voluntarily elected to participate in the Incentive Plan, agreed to abide by the specified conditions for receipt of the incentive payments, and then failed to do so, we conclude that the employees are not entitled to retain the incentive payments. Accordingly, we affirm.

I

Allegis, a Maryland corporation, and its subsidiaries, Aerotek and TEKsystems, are engaged in the business of "locating, selecting, screening, mobilizing and placing candidates in temporary and permanent employment positions" for clients throughout the United States. Aerotek concentrates specifically on staffing scientific, software, and engineering positions for its clients, which include the Department of Defense and other governmental agencies. And TEKsystems concentrates on staffing information technology ("IT") and communications positions for its clients, which also include the Department of Defense and other governmental entities. Allegis's subsidiaries operate in close collaboration with one another. Indeed, employees of Aerotek and TEKsystems "have access to much of the proprietary information of the other . . . including active customer histories and analysis, lists of key contacts, information for recruiters on candidates . . . ,

bill rate information, and prospective client lists." The companies also conduct joint training and laterally promote each other's employees, even at high levels.

Defendants Justin Jordan, Daniel Curran, Michael Nicholas, and Chris Hadley were high-level employees of Aerotek. Jordan worked for Aerotek for almost 15 years, ascending through its ranks and ultimately becoming the Regional Vice President for Aerotek's mid-Atlantic region. Curran, Nicholas, and Hadley served as national account managers. Each of these employees signed an Employment Agreement with Aerotek containing restrictive covenants of non-competition and non-solicitation. Specifically, Jordan's agreement provided that he could not, for two years after the end of his employment, (1) engage in the work he performed at Aerotek in any State of the United States or Province in Canada where Aerotek conducted business, (2) solicit customers of Aerotek, or (3) solicit employees of Aerotek or two other Allegis subsidiaries. The agreements signed by Curran, Nicholas, and Hadley contained covenants that were similar but limited to a 100-mile radius and an 18-month time period.

In addition to signing Employment Agreements with Aerotek, these four employees qualified for and elected to participate in the Incentive Plan offered by Aerotek's parent, Allegis. At a general level, the Incentive Plan provided employees with incentive payments in exchange for continuing loyalty and protection of the Allegis companies' interests for a 30-month period following the employees' separation from Allegis or any of its subsidiaries. Allegis created the Incentive Plan "to provide a method whereby a select group of management or highly compensated employees of Allegis Group and its subsidiaries [including Aerotek and TEKsystems] . . . [could] become eligible to acquire

5

an interest in the economic progress of the Companies, an incentive to promote the best interest of the Companies, and, in particular, an incentive to promote the long term economic growth of the Companies."

Under the Incentive Plan, qualified employees who elected to participate could, during their employment, earn "Units," which were "economically equivalent to the sum of (i) the Fair Market Value of one share of Allegis Group's common stock, plus (ii) the excess, if any, of (a) the aggregate Cash Dividends made by Allegis Group with respect to one issued and outstanding share of common stock of Allegis Group, over (b) the aggregate cash distributions made by the Companies with respect to one Unit." Although the Units were awarded annually, they "ha[d] no value other than as a potentiality of income that [could] be earned in accordance with the terms and conditions of [the Incentive] Plan."

On separation from service, a Plan participant would be entitled to receive payments equivalent to the value of the Units over a 30-month period. The entitlement to payments, however, was conditioned on the participant's compliance during the 30-month period with the restrictions imposed by the Plan. Specifically, as relevant to this appeal, Section 9 of the Plan provided:

> In order to earn and become entitled to receive payment for the Units allocated to a Participant pursuant to the Plan, the Participant shall not, during the thirty (30) month period following the date of his or her Separation from Service . . . :

>                *      *      *

> (3) Approach, contact, solicit or induce any Regular Employee of the Companies: (a) to provide services to any individual, corporation or entity whose business is competitive with any of the Companies, or (b) to leave the employ of any of the Companies;

6

\*　　\*　　\*

(5) In any way, solicit, divert or take away any staff, temporary personnel, trade, business, or good will from the Companies; solicit accounts or personnel which became known to the Participant through his or her employment with the Companies; influence or attempt to influence any of the Companies' customers or personnel not to do business with the Companies . . . .

The Plan provided further that these conditions were "material and essential terms in any award of Units" and that if they were to be "held or found invalid or unenforceable for any reason whatsoever . . . [the] Participant shall return to the Companies any and all amounts that he or she has received."

On departing from Aerotek, at least three of the four employees (Jordan, Curran, and Nicholas) signed an "Acknowledgment Letter" reiterating the benefits and conditions of the Incentive Plan. The Acknowledgment Letter provided, in relevant part:

Pursuant to the terms of the Plan, your ability to earn and receive payment for the units, and the Company's obligation to pay you for the value of the units, are subject to your compliance with the terms and conditions contained in Section 9 of the Incentive Investment Plan. You acknowledge and agree that any breach by you of the terms and conditions of Section 9 of the Allegis Group Incentive Investment Plan will terminate your ability to earn the units and release the Company from its payment obligations with respect to the vested units allocated to your account. In addition, in such an event, you agree to refund to the Company any amounts previously paid to you or applied for your benefit with respect to such units.

Jordan resigned as an employee of Aerotek on February 21, 2009, and, as provided in the Plan, received periodic incentive payments ultimately totaling over $1.4 million, the value of his accrued Units. But during the 30-month period following his separation from service, Jordan incorporated two companies — Zachary Piper, LLC, and Piper Enterprise Solutions — to engage in the staffing industry with a specific focus on "the high end of the

7

IT and engineering world." Zachary Piper began business operations sometime between October 20, 2010, and January 2011 and "booked its first revenue in February 2011." By the end of the 30-month period in August 2011, Zachary Piper had billed $130,000 for staffing services provided to Lockheed Martin, Catalyst Health Solutions, Catalyst Rx, and Siteworx, all of which were former clients of TEKsystems, an Allegis subsidiary. Piper Enterprise likewise operated in the IT staffing space during the 30-month period.

In addition, "in the summer of 2011," before the end of the 30-month period, Jordan contacted Curran and Hadley to discuss the possibility of their employment at his Piper companies. And on August 19, 2011, just days before the end of Jordan's 30-month period, Curran and Hadley began an email exchange with each other in which Curran referenced an "initial comp idea." Hadley later explained that this referred to Jordan's compensation proposal to Hadley. Following the expiration of Jordan's 30-month period, which ended on August 21, 2011, Jordan officially hired Curran, Hadley, and Nicholas to work for his Piper companies. Each was hired during his respective 30-month period.

During Jordan's 30-month period, he received $1,452,443 in incentive payments. Curran, who resigned from Aerotek on September 16, 2011, to work for Jordan, received $17,702 in incentive payments before Allegis discovered the arrangement and ceased payments. Nicholas, who resigned from Aerotek on January 3, 2012, to work for Jordan, received $6,195 before Allegis discovered the arrangement and ceased payments. Hadley resigned on April 6, 2012, to work for Jordan, but by then Allegis was aware of the situation and made no incentive payments to him under the Incentive Plan. During the respective 30-month periods following their separations from service, Curran, Hadley, and Nicholas

8

all provided staffing services to TEKsystems' clients as part of the work they performed for Jordan's companies.

In July 2012, Allegis, Aerotek, and TEKsystems commenced this action against the four former employees, alleging, among other things, that they breached their obligations under the Incentive Plan and the restrictive covenants of their Employment Agreements. As a remedy, the plaintiffs sought return of all payments made to the employees under the Plan and compensatory damages. Following discovery, the parties filed cross-motions for summary judgment. While the plaintiffs sought enforcement of the Employment Agreements and the Incentive Plan, the defendants contended that both the Employment Agreements and the conditions of the Incentive Plan were unenforceable on the ground that they were overbroad.

The district court granted summary judgment to Allegis, Aerotek, and TEKsystems on their claim made under the Incentive Plan and ordered the defendants to return the incentive payments that they had received, with interest. In reaching this conclusion, the court held that Sections 9(3) and 9(5) of the Incentive Plan — the provisions that were allegedly breached — were not overbroad and therefore were enforceable under Maryland law. With respect to Jordan's Employment Agreement, on the other hand, the court found that the restrictive covenant of employee non-solicitation was unenforceable as overbroad.

From the district court's judgment dated June 12, 2018, the defendants filed this appeal, which challenges only the district court's ruling that the defendants were not entitled to any payments under the Incentive Plan.

9

## II

The four defendant employees contend that they need not return any payments received under the Incentive Plan because the Plan imposed "restrictive covenants" that are "unenforceable because their scope is not reasonably tailored to protect legitimate business interests" — a requirement of the reasonableness standard that is applied under Maryland law to restrictive covenants in employment contracts. They explain that Sections 9(3) and 9(5) of the Incentive Plan "impose restraints that encompass not only Aerotek, but rather its parent, Allegis, and *any* of its subsidiaries" and they assert that "[b]ecause Sections 9(3) and 9(5) are not limited to Jordan, Curran, Nicholas and Hadley's sole employer — Aerotek — they are not tied to a legitimate protectable business interest." Accordingly, they maintain, Sections 9(3) and 9(5) are legally unenforceable.

The Allegis companies argue that Sections 9(3) and 9(5) are reasonable in scope, noting that the value of the incentive payments is affected by the profits of all of the Allegis subsidiaries — not just Aerotek — and that it is therefore reasonable for the Incentive Plan restrictions to protect all of the Allegis subsidiaries' business interests. They point out that, unlike the non-solicitation and non-competition provisions contained in the defendants' Employment Agreements, the requirements of Sections 9(3) and 9(5) in the Incentive Plan are specifically designed to promote *the Allegis companies*' economic development. They also note that the Incentive Plan's participants could choose, on the one hand, to abide by the conditions designed to promote the companies or, on the other, to forfeit the incentive payments and compete without the Plan's restrictions. Based on the Plan's structure, they distinguish the Section 9 provisions from restrictive covenants in employment agreements,

10

which are upheld only if reasonable. Instead, the companies categorize the provisions as "conditions prerequisite to obtaining payment" or, at most, to forfeiture provisions, which do not necessarily receive the same level of scrutiny as restrictive covenants. *See Rochester Corp. v. Rochester*, 450 F.2d 118, 122–23 (4th Cir. 1971) ("The strong weight of authority holds that forfeitures for engaging in subsequent competitive employment . . . are valid, even though unrestricted in time or geography. The reasoning behind this conclusion is that the forfeiture, unlike the restraint included in the employment contract, is not a prohibition on the employee's engaging in competitive work but is merely a denial of the right to participate in [a benefit] if he does so engage" (cleaned up)).

Thus, while the defendants focus solely on the reasonableness standard applicable to restrictive covenants in employment contracts in Maryland, the plaintiffs point out that the Incentive Plan's relevant provisions cannot fairly be categorized as restrictive covenants because they do not constitute "prohibition[s] on the employee's engaging in competitive work," given the choice available to the employee. *See Rochester*, 450 F.2d at 123. Moreover, the plaintiffs distinguish between provisions that require forfeiture of *accrued* benefits for noncompliance and provisions establishing conditions for the receipt of *additional* benefits.

To resolve whether the Plan imposes restrictive covenants or forfeiture provisions or simply imposes conditions precedent for incentive payments, we begin with the text, as we must. The issue is thus "a question 'of construction dependent on the intent of the parties to be gathered from the words they have employed.'" *NCO Fin. Sys., Inc. v. Montgomery Park, LLC*, 842 F.3d 816, 822 (4th Cir. 2016) (quoting *Chesapeake Bank of*

11

*Md. v. Monro Muffler/Brake, Inc.*, 891 A.2d 384, 391 (Md. App. 2006) (quoting *Chirichella v. Erwin*, 310 A.2d 555, 557 (Md. 1973))). "Conditions are indicated by words and phrases such as 'if,' 'provided that,' and 'when.'" *Id*.

Based on a plain reading of the text, Sections 9(3) and 9(5) of the Incentive Plan state conditions for payment, rather than restrictive covenants or forfeiture provisions. The text of the Plan begins with a statement of the Plan's purpose, which is to offer to management and highly compensated employees the opportunity to "acquire an interest in the economic progress" of the Allegis companies and "an incentive to promote" those companies' best interests, including their "the long term economic growth." The statement of purpose provides further that, to effectuate this purpose, employees can become eligible to receive payments tied to the companies' growth, "*subject to the conditions*" stated in the Plan to protect such growth. (Emphasis added). Section 9 sets forth those conditions, beginning with the language, "*[i]n order to earn and become entitled* to receive payment[s]," the participant must comply with restrictions in competitive activities for 30 months following their separation of service. (Emphasis added). It continues that "*[i]f* the participant complies" with the conditions of Section 9, the company must then pay the incentive amounts specified by the Plan. (Emphasis added). Finally, Section 9 states that the conditions "are material and essential terms" for receiving incentive payments.

Based on the Plan's text, we conclude that Sections 9(3) and 9(5) are conditions precedent, not restrictive covenants or forfeiture provisions, inasmuch as the Incentive Plan explicitly uses words indicative of conditionality. It provides that incentive payments are offered "subject to the conditions" stated and that, "in order to earn" incentives, the

12

participant must comply with the conditions. In other words, if and only if the participant complies is he entitled to receive payments. In this manner, the Incentive Plan unambiguously imposes conditions precedent for the receipt of payments. And, so long as they are enforceable, such conditions must, under Maryland law, be strictly complied with — "exactly matched" — to entitle the employees to the benefit of their bargain. *NCO Fin. Sys.*, 842 F.3d at 822 (quoting *Elderkin v. Carroll*, 941 A.2d 1127, 1133 (Md. 2008)).

As a general matter, unambiguous language of a valid contract is enforced in Maryland as written, including language that creates express conditions of performance. *See Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007) ("If the language of a contract is unambiguous, we give effect to its plain meaning …"); *Standefer v. Thompson*, 939 F.2d 161, 164 (4th Cir. 1991) ("[W]e may certainly construe a contract as conditional if its plain language compels us to do so"). But it is also well settled that a restrictive covenant in a contract of employment is enforced only insofar as the restraint is reasonable under the circumstances. *See Silver v. Goldberger*, 188 A.2d 155, 158 (Md. 1963). And in Maryland specifically, courts apply a similar reasonableness standard to determine the enforceability of provisions that subject employees to a forfeiture of employment benefits should they engage in competition. *See Food Fair Stores, Inc. v. Greeley*, 285 A.2d 632, 638 (Md. 1972) (expanding the applicability of the restrictive covenant reasonableness standard). But the defendants have pointed to no case in which a *condition precedent* has been reviewed for reasonableness, even in the employment context.

The defendants nonetheless argue that the conditions in the Incentive Plan at issue here function as forfeiture provisions and therefore fall within the ambit of *Greeley*. In

13

*Greeley*, a former employee of a grocery store sued the store after it stopped making pension payments to him on the ground that he had violated the pension plan policy against competition when he took a job with an alleged competitor. 285 A.2d at 634. The Court of Appeals of Maryland observed that Greeley was, in practical terms, restrained "by virtue of a pension plan, which holds over the employee the loss of benefits should he compete" and that the pension plan policy was therefore similar to a restrictive covenant in an employment agreement. *Id*. at 638. The court accordingly analyzed the pension plan in light of its precedent on restrictive covenants, taking into account the reasonableness of the restraint, and held that it was unreasonable in the circumstances. *Id*. at 638–39.

But the pension plan in *Greeley* is hardly comparable to the Incentive Plan before us, and the differences between the two illustrate why it is far from a foregone conclusion that Maryland courts would apply the same reasonableness standard to conditions precedent like the ones at issue here. In practical terms, the threat of a loss of earned pension benefits to a former grocery store manager was coercive, whereas the loss of benefits under the Incentive Plan is, in the circumstances, better seen as elective. Participants in the Incentive Plan were well compensated, high-level professionals who were given *the option* to join the program during their employment and, following separation, had the *further choice* of whether to receive payments *or* to compete with Allegis and its subsidiaries. By the express terms of the Plan, the Units that accrued had no value during the period of the participants' employment, and therefore they were not a supplement to the participants' salary or benefits. Rather, their value was earned after the participants' employment ended through compliance with the post-employment

14

conditions. As a result, the Incentive Plan payments more closely resembled consideration for post-employment services provided to Allegis than a coercive deferred benefit of the defendants' employment with Aerotek. Thus, there is a good reason for treating this type of agreement differently — and more deferentially to the terms of the parties' agreement — than a pension plan with restrictive features. And the defendants put forth no argument that the conditions would be unenforceable under any other standard.

Even if "reasonableness" were the applicable standard, we would conclude that the conditions imposed by the Incentive Plan passed muster. Under the reasonableness standard, restrictions are enforceable so long as they are "confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Greeley*, 285 A.2d at 638 (quoting *MacIntosh v. Brunswick Corp.*, 215 A.2d 222, 225 (Md. 1965)). In this case, the Incentive Plan explicitly named the business interests that its conditions were intended to protect — the long-term economic growth of Allegis and its subsidiaries, as measured by the value of Allegis's stock. We conclude that this is a legitimate interest appropriately served by the conditions stated in the Plan. Indeed, the district court *did* apply a reasonableness standard to evaluate the enforceability of the provisions, and it concluded that they were appropriately tailored to protect the legitimate business interests of Allegis and its subsidiaries. As the district court stated:

> Although Messrs. Jordan, Curran, Hadley and Nicholas only worked for Aerotek, all Allegis subsidiaries contribute to the value of the [Incentive Plan] payments. The value of [the Incentive Plan] payments is determined,

15

in part, by the value of Allegis's common stock, . . . and the financial performance of all Allegis subsidiaries affects the value of that stock.

* * *

Because Messrs. Jordan, Curran, Hadley and Nicholas all have the potential to trade on their goodwill with large customers to take business away from not only Aerotek, but also other Allegis subsidiaries, Section 9(5)'s scope is not wider than is reasonably necessary to protect the business or goodwill of Allegis or its subsidiaries.

To be sure, the restrictions contained in Section 9 of the Incentive Plan might be broader than would be appropriate in an employment agreement between the defendants and Aerotek. But because the Incentive Plan agreements were executed between the defendants and Allegis, *not* between the defendants and Aerotek alone, the restrictions must be reasonably tailored to protect the business interests of Allegis and its subsidiaries as measured by Allegis's stock value. Moreover, the record indicates that although the defendants were employed by Aerotek, there was substantial overlap between the clients of and services provided by Allegis's various subsidiaries. There was therefore significant risk of harm to those subsidiaries if former high-level employees could immediately proposition other subsidiaries' clients and solicit their employees. Accordingly, we conclude that the scope of the restrictions was appropriately tailored.

Moreover, the Section 9 restrictions do not impose an undue hardship on the defendants. They voluntarily participated in the Incentive Plan and, upon separating from the company, faced the choice of (1) refraining from competitive activity for a 30-month period in exchange for payments *or* (2) competing during that period and foregoing the payments. Thus, if the employees believed that they could earn more in income by

16

competing in the market for staffing services than they were entitled to receive under the Incentive Plan, they were free to do so, and indeed it appears some of the defendants consciously did so.

Finally, public policy favors the freedom to contract for such a plan. Unlike traditional restrictive covenants, which may benefit the employer at the expense of the former employee's ability to earn a livelihood, both employers and employees benefit under agreements such as the Incentive Plan. Highly compensated employees like the defendants might well prefer to refrain from competing temporarily in exchange for post-employment payments — payments which they would not otherwise be owed and which do not constitute general benefits of employment. But companies in highly competitive industries might not offer these plans if they were themselves unable to fully benefit from such contractual arrangements.

At bottom, we affirm the district court's conclusion that Sections 9(3) and 9(5) of the Incentive Plan are enforceable against the defendants as participants in the Plan.

III

On the question of whether the defendants fulfilled the conditions of the Incentive Plan, Curran, Hadley, and Nicholas do not argue in their opening brief on appeal that they did in fact comply with the conditions. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) ("[A]n issue first argued in a reply brief is not properly before a court of appeals"). In any event, as the district court concluded as a matter of law, these three employees "all took business away from TEKsystems" during the 30-month period

17

following their separation of service. This conclusion was based on undisputed evidence in the record that, in their subsequent employment with the Piper companies, they provided IT staffing services to clients who had recently purchased those services from TEKsystems. Moreover, the record indicates that in their employment with the Piper companies, they specifically targeted TEKsystems' clients and attempted to divert business during their restricted periods. For instance, an email exchange showed that during the relevant 30-month period, Hadley solicited a TEKsystems' client, advised the client via email against signing an exclusivity agreement with TEKsystems, and then forwarded the email to Jordan with the message, "TEK[systems] has placed 6 people in the last 6 months. They have the lock down on this place . . . until NOW." Jordan replied, "I love it. Lets take them DOWN!"

On this record, no reasonable factfinder could conclude that Curran, Hadley, and Nicholas were in compliance with the conditions of the Incentive Plan during the 30-month period following their departures from Aerotek.

Jordan, however, directly challenges the district court's conclusion that no factual issues exist regarding his breach of the Incentive Plan conditions, maintaining that "[t]here remains a general dispute concerning whether a handful of 30,000-foot conversations between close friends that took place within weeks of the end of [his] 30-month non-solicitation period constituted a breach of Section 9(3)." This argument, however, fails to account for the undisputed evidence of record on which the district court relied.

The record shows that within months of his departure from Aerotek, Jordan incorporated the Piper companies with the purpose of entering the staffing industry and

18

focusing on the "high end of the IT and engineering world," the space also served by TEKsystems. In June 2010, some 16 months after separating from Aerotek, Jordan sent his accountant business expenses related to his "Zachary Piper Venture," including business development expenses, such as meals with representatives of Lockheed Martin, a TEKsystems client. Between October 2010 and January 2011, still within the 30-month period, one of the Piper companies began business operations, and it booked revenue in February 2011. And by the end of the 30-month period following his departure, Jordan had conducted business with Lockheed Martin, Catalyst Health Solutions, Catalyst Rx, and Siteworx — all TEKsystems customers — billing them over $130,000, including $42,000 billed to Lockheed Martin alone.

Jordan also conceded that "in the summer of 2011," he solicited Hadley and Curran, ultimately hiring them after his 30-month restriction period expired. He argues, however, that the phrase "in the summer in 2011" was not limited to time within the 30-month period following his departure, which ended August 21, 2011. Nonetheless, the record shows violative conduct before August 21. For instance, there is evidence of an August 19, 2011 email exchange between Curran and Hadley in which the two men, then employees of Aerotek, discussed a compensation package that Jordan had proposed to Hadley for employment with one of the Piper companies. The only available inference to be drawn from this exchange is that Jordan had approached Hadley about leaving Aerotek *prior to August 19*. And, of course, the significance of the conversation is reaffirmed by the fact that Jordan hired Hadley and Curran shortly after his 30-month period expired.

19

In sum, Jordan has set forth no facts suggesting a genuine dispute about the evidence that demonstrates that he "approached, contacted, solicited or induced" Hadley and Curran to leave Aerotek to join his company during the 30-month period following his separation. And although this solicitation occurred shortly before Jordan's 30-month period expired, Maryland law is clear that *substantial* compliance is not sufficient to satisfy a condition precedent. *See Elderkin*, 941 A.2d at 1133. In addition, Jordan solicited and obtained business from TEKsystems' customers during this same period. Thus, the district court correctly concluded that any rational factfinder viewing the record as a whole would find that Jordan, like his colleagues, failed to fulfill the conditions for payment imposed in the Incentive Plan.

IV

Finally, the employees challenge the district court's determination that rescission of the Plan was the appropriate remedy and its corresponding order directing them to return any incentive payments made to them, with interest, as restitution. They argue that the court erred because (1) any breach was not material; (2) the companies did not show that damages are "incalculable or inadequate"; (3) the benefits conferred by the employees on the companies by partially complying with the Incentive Plan restrictions cannot be returned; and (4) equity does not favor rescission.

The district court rejected the employees' arguments, addressing in some detail the employees' contention that rescission was not appropriate because the companies could not realistically return the consideration that they received under the Incentive Plan, *i.e.*,

20

the benefit of the employees' partial compliance. The court explained, "When it would be most equitable to allow rescission, even though restoration is impossible or undesirable, the modern tendency is to allow relief. . . . Thus, even though rescission usually requires plaintiffs to restore the consideration they received, restoration is not required here." (Cleaned up).

We need not resolve this issue, however, because of our conclusion that the Incentive Plan makes compliance with Section 9 a *condition precedent* to payment. As we have described more fully above, the unambiguous language of the Incentive Plan so provides explicitly. *See Gilbane Bldg. Co. v. Brisk Waterproofing Co.*, 585 A.2d 248, 250 (Md. Ct. Spec. App. 1991) ("[C]ourts are not at liberty to ignore the clear and unambiguous language of a contract"). The Plan states that "*[i]f the participant complies* with the terms and conditions of this Section 9[,] . . . [Aerotek] shall have the obligation to pay such participant [the incentive payments]." (Emphasis added). By its very terms, then, the Incentive Plan conditions Aerotek's obligations to make payments on the participant's compliance with the Section 9 restrictions. And Section 9 further confirms this, providing that "*in order to earn and become entitled* to receive payment," a participant must refrain from the listed activities "during the thirty (30) month period following his or her separation from service." (Emphasis added). In other words, only if a former employee honors the conditions set forth in Section 9 for the entire 30-month period is the company required to pay incentive payments. And under Maryland law, the employees' conduct must "exactly match" the terms of these conditions for the conditions to be deemed satisfied, *NCO Fin. Sys.*, 842 F.3d at 822 (quoting *Elderkin*, 941 A.2d at 1133), as

21

Maryland law does not recognize *substantial* compliance with a condition precedent, *Elderkin*, 941 A.2d at 1133.

Thus, the straightforward reading of the text indicates that the parties intended compliance with Section 9 to be an all-or-nothing deal, even though the payments commenced before the former employees completed their performance. This is further evidenced by the Plan's requirement that if any provision of Section 9 were to be found invalid, the participant would be obligated to "return to the companies any and all amounts that he or she has received." Because compliance with the conditions of Section 9 for the entire 30-month period was required for receipt of the incentive payments yet none of the defendant employees satisfied the conditions, Allegis is relieved from its obligation to pay and is entitled to a return of payments already made.

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

22

DIAZ, Circuit Judge, dissenting:

My colleagues conclude that the employee- and client-nonsolicitation provisions of the Allegis Group's Incentive Investment Plan are enforceable against the defendants because, in their view, Maryland courts don't scrutinize these provisions for their reasonableness, and even if they did, the provisions are appropriately tailored to protecting the Allegis Group's self-professed interest in its long-term economic wellbeing. Because I cannot agree that Maryland law exempts these provisions from the reasonableness review applied to all similar covenants, or that they are no broader than reasonably necessary to protect an interest that Maryland recognizes as legitimate, I respectfully dissent.

A.

If we were writing on a clean slate, I would hold that the defendants in this case forfeited their right to receive post-employment benefit payments from the Allegis Group by failing to comply with Sections 9(3) and 9(5) of the Incentive Plan for their full 30-months terms of obligation. As we recognized in *Rochester Corp. v. Rochester* (a case involving Virginia law), "the strong weight of authority holds" that such "forfeitures for engaging in subsequent competitive employment . . . are valid" even if they are "unrestricted" in scope. 450 F.2d 118, 122–23 (4th Cir. 1971). "The reasoning behind" this majority position—that anticompetitive forfeiture provisions in *post*-employment contracts are as enforceable as any other contractual promise, without regard to reasonableness—"is that the forfeiture, unlike the restraint included in the *employment* contract, is not a prohibition on the employee's engaging in competitive work," but rather

23

"merely a denial of the right to participate in the [benefit] plan if he does so engage." *Id.* at 123 (emphasis added).

Notwithstanding this sensible reasoning, the problem for the Allegis Group is that Maryland takes a different view. *See Food Fair Stores, Inc. v. Greeley*, 285 A.2d 632, 638 (Md. 1972). *Greeley* involved a former manager of a Food Fair grocery store, who, after five years of employment, had become a participant in the company's "Incentive Bonus and Retirement Plan." *Id.* at 634. After being denied benefit payments in the aftermath of his resignation, Greeley sued to recover the "monies allegedly due him pursuant to the terms of the Plan," which Food Fair asserted he had forfeited by breaching the Plan's noncompete provision, Section 7.1. *Id.*

Recognizing that the Food Fair Plan didn't present "the classic" noncompete situation because Greeley would have been "free to engage in competition without restraint or interference" had he declined the benefits, and that many states held such agreements "to a rather rigid contractual interpretation," the high court of Maryland nonetheless held that "[t]he principle of reasonableness . . . must be taken into consideration not only regarding restrictive covenants in an employment contract, but [also] in a pension plan." *Id.* at 638. The court's departure from the majority view rested on the reasoning that, "in either instance, the employee is subject to an economic loss should [h]e breach the restrictive covenant." *Id.*; *see also Holloway v. Faw, Casson & Co.*, 572 A.2d 510, 514–15 (Md. 1990) (applying *Greeley* to a forfeiture provision "similarly designed to protect [the employer] from the loss of clients by reducing the economic benefit which the withdrawing [employee] might otherwise derive").

24

In holding that the Incentive Plan isn't subject to the same scrutiny applied to the plan in *Greeley*, the majority articulates three distinctions—none of which I find persuasive. First, the majority erects an untenable dichotomy between the "conditions precedent" of the Incentive Plan and the "restrictive covenants or forfeiture provisions" of the *Greeley* plan. Op. at 12. But as *Greeley* makes abundantly clear, these categorizations cannot be separated. Indeed, the clause at issue in *Greeley* constituted a forfeiture provision precisely because it established a condition precedent to the plaintiff's receipt of benefits. *See* 285 A.2d at 634 ("The Plan . . . stipulates that distribution is subject to the conditions imposed upon post-employment conduct which are contained in Section 7.1 . . . ."). If Greeley failed to comply with Section 7.1's conditions, he "forfeit[ed]" those "benefits." *Id.* (quoting Section 7.1). And because Section 7.1 of the plan restricted Greeley's "post-employment conduct," *id.*, it was necessarily a "restrictive covenant" as well, *id.* at 638. *Greeley* was thus plainly a case "in which a *condition precedent*"—viewed properly as *both* a forfeiture provision *and* a restrictive covenant—"[was] reviewed for reasonableness" under Maryland law. Op. at 13.

Second, the majority asserts that the *Greeley* plan is "hardly comparable to the Incentive Plan" because, whereas "the threat of a loss of earned pension benefits to a former grocery store manager was coercive" there, here "the loss of benefits under the Incentive Plan is . . . better seen as elective." Op. at 14. But *Greeley* doesn't support this distinction. For starters, as a "seasoned and experienced store manager" who was invited to participate in a benefit plan "maintained for the executive, administrative, and supervisory personnel of the company," 285 A.2d at 634, 639, Greeley would seem to have been a relatively

25

"well-compensated, high-level professional[]" in his particular line of business, Op. at 14; *see also Holloway*, 572 A.2d at 514–15 (following *Greeley* where the employee was a former partner of an accounting firm). And in any event, the *Greeley* court gave no indication that its holding hinged on any perceived coerciveness; to the contrary, the court reached its holding despite recognizing that the noncompete covenant *wasn't* as coercive as those found in employment contracts. *See* 285 A.2d at 638; *see also Holloway*, 572 A.2d at 514–15 (following *Greeley* without perceiving any coerciveness about the forfeiture provision). Further, like the defendants in this case, Greeley too was "given *the option* to join the program during [his] employment and, following separation, had the *further choice* of whether to receive payments *or* to compete" with his former employer, Op. at 14. The majority's distinction thus fails of its own weight.

Finally, the majority suggests a distinction in that the benefits under the Incentive Plan accrued "no value during the period of the participants' employment," whereas the benefits under the *Greeley* plan were "earned." *See* Op. at 14. But *Greeley* provides no basis for attaching any significance to this distinction either. To the extent that the *Greeley* court even discussed this detail, it suggested that the benefits sought by the plaintiff were *not* earned or accrued. *See* 285 A.2d at 634–35 (observing that Greeley sought "accrued vacation pay" in addition to "the proceeds of the Plan's benefits," implying by omission that the latter weren't accrued). The court also noted that the *Greeley* plan applied equally to benefits "whether or not vested." *See id.* at 634 (quoting Section 7.1). And semantics aside, it seems to me that Greeley and the defendants in this case occupied the same positions with respect to their post-employment benefits—having each earned the

26

*opportunity* to receive a certain sum of money, calculated based on their respective contributions as employees, in exchange for complying with restrictions on their post-employment conduct. The majority thus fails to distinguish the Incentive Plan from the *Greeley* plan in this respect as well.

Because, in sum, I discern no persuasive basis for treating the Incentive Plan in this case different from the incentive plan in *Greeley*, and because no case has diminished *Greeley*'s approach in the years since, I am obliged to conclude that Maryland law would treat Sections 9(3) and 9(5) of the Plan no differently than any other covenant not to compete.

B.

"The general rule in Maryland, as in most jurisdictions," is that covenants not to compete "will be sustained if the restraint on trade is confined within limits which are no wider . . . than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Ruhl v. F.A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (Md. 1967). As we stated in *Deutsche Post Global Mail, Ltd. v. Conrad*, "[a] review of Maryland case law reveals four requirements that must be met for a restrictive covenant to be enforceable: (1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy." 116 F. App'x 435, 438 (4th Cir. 2004) (citing *Silver v. Goldberger*, 188 A.2d 155, 158 (Md. 1963)).

27

With regard to the first element, Maryland law appears to have discerned a sole interest that employers are entitled to protect by means of covenants not to compete: the interest "in preventing departing employees . . . from trading on the goodwill they helped to generate while employed." *Deutsche Post*, 116 F. App'x at 438; *see also Holloway*, 572 A.2d at 515; *Food Fair*, 285 A.2d at 639; *Ruhl*, 225 A.2d at 291–92; *Silver*, 188 A.2d at 158. The second element cabins the restriction by requiring that it be "no wider in scope" than "reasonably necessary" to protect this interest. *Deutsche Post*, 116 F. App'x at 438. While many jurisdictions have reasoned (in the context of client-nonsolicitation provisions) that the relevant interest doesn't extend to preventing a former employee from soliciting clients "for whom he did not perform services" given that he "does not hold an unfair competitive edge over [the employer] in relation to those clients," *see, e.g.*, *Singer v. Habif, Arogeti & Wynne, P.C.*, 297 S.E.2d 473, 475–76 (Ga. 1982)—*Holloway* suggests that, in Maryland, the interest may extend to all of the employer's clients, at least where the former employee was generally "in a position to establish a personal relationship with [those] clients," *see* 572 A.2d at 516.[1]

However wide *Holloway*'s breadth may be, and despite the dearth of Maryland case law in the context of subsidiaries, I find it implausible to conclude that Sections 9(3) and 9(5) of the Plan are no wider in scope than reasonably necessary to protect the Allegis Group's interest in preventing the defendants from trading on the goodwill they helped

---

[1] Though Maryland courts don't appear to have specifically addressed employee-nonsolicitation provisions, I presume they would find reasonable the same scope of restriction as in the client-nonsolicitation context.

generate while employed by Aerotek. Indeed, these covenants—which restrict the defendants from soliciting any employee or client not only of Aerotek, but also of *any* of the Allegis Group's *ten* subsidiaries, which run the gamut of the staffing industry—could hardly be broader.

Even assuming it would be reasonable for Sections 9(3) and 9(5) of the Plan to encompass the clients and employees of TEKsystems in light of their "substantial overlap" with those of Aerotek, Op. at 16, the record reveals no such overlap with any of the Allegis Group's other eight subsidiaries, which specialize in disparate areas of the staffing market. *See Our Brands*, Allegis Group, https://www.allegisgroup.com/en/brands (last visited Feb. 27, 2020). Because the Plan provisions thus unreasonably encompass the entire Allegis Group, and because their overbreadth cannot be severed under Maryland blue-penciling law, I would conclude that they can't be enforced against the defendants.[2]

My colleagues instead say that the provisions are reasonable in scope because "the Incentive Plan explicitly name[s] . . . the long-term economic growth of Allegis and [all] its subsidiaries" as "the business interests that its conditions were intended to protect." Op. at 15. But the majority cites no authority for its conclusion that "this is a legitimate interest"

---

[2] Maryland blue-penciling law allows a court to "excise" an overbroad restrictive covenant "if the offending provision is neatly severable," but not to "rearrange or supplement the language of the restrictive covenant." *Deutsche Post*, 116 F. App'x at 439 (citing, *inter alia*, *Tawney v. Mut. System of Maryland,* 47 A.2d 372, 379 (Md. 1946)). Here, the overbreadth cannot be remedied via blue-penciling because Sections 9(3) and 9(5) of the Plan each revolve around the word "companies," *see* J.A. 456–57, which Section 2(g) defines to include "all of" the Allegis Group's subsidiaries "collectively," *see* J.A. 452. These provisions thus cannot be brought within reasonable limits without being rewritten.

under Maryland law, *see id.*, or that it becomes one merely because the Incentive Plan articulates it. Nor could this be so, for such reasoning would allow employers to draft restrictions of whatever scope they wish as long as they offered enough money in return. In short, an employer "cannot simply buy a covenant not to compete" by offering the right amount of "consideration." *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 784 (Tex. 2011) (Willett, J. concurring). Regrettably, I believe that is precisely what the majority has allowed the Allegis Group to do in this case.

## C.

My view that the Plan provisions are unenforceable under Maryland law doesn't mean that Allegis Group has no recourse. While the Allegis Group couldn't recover under a breach of contract theory, it may pursue "a claim in restitution for [the] performance that [it] has rendered under or in return for a promise that is unenforceable on grounds of public policy." *See Bagel Enters., Inc. v. Baskin & Sears*, 467 A.2d 533, 540 (Md. Ct. Spec. App. 1983) (quoting Restatement (Second) *Contracts* § 198)). The Allegis Group would thus be able, under Count IV of the amended complaint (which the district court declined to rule on), to recover the amount of damages necessary to prevent the defendants from being unjustly enriched. *See Mogavero v. Silverstein*, 790 A.2d 43, 52–53 (Md. Ct. Spec. App. 2002); *see also* Restatement (Second) *Contracts* § 371.[3] Whatever that amount would prove to be in this case, it suffices to observe that the Allegis Group is not without a remedy.

---

[3] The measure of restitution would not depend on Section 9's provision that a participant in the Plan "shall return to the Companies any and all amounts that he or she has received or is otherwise entitled to receive . . . [i]n the event that any provision of this

\*　　\*　　\*

For the foregoing reasons, I respectfully dissent.

---

Section 9 of the Plan is held or found invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction," J.A. 458, because, under fundamental principles of contract law, no contractually provided remedy is available without a breach of contract. *See* Restatement (Second) *Contracts* § 345.